Russell Lee GANT, Appellant,

v.

The STATE of Texas, Appellee.

No. 473–82.

Court of Criminal Appeals of Texas,
En Banc.

March 23, 1983.

Catherine E. Greene, Houston, for appellant.

Felipe Reyna, Dist. Atty. John W. Segrest and Lynn Malone, Asst. Dist. Attys., Waco, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

In an unpublished opinion the Waco Court of Appeals affirmed a judgment of conviction based on a jury verdict finding appellant guilty of murder and assessing his punishment at confinement for a term of forty five years. To do so the Court overruled five grounds of error presented by appellant, the adverse rulings on two of which are so stoutly challenged in his petition for discretionary review that we granted it in order to address them: first, his substantial constitutional claim that his invalid arrest rendered his resultant confession inadmissible was erroneously rejected by the court . through its own misreading and faulty application of the opinion of this

Court in *Cannady v. State,* 582 S.W.2d 467 (Tex.Cr.App.1979) and, second, in any event, the court wrongfully overruled his contention that from his confession there should have been excised his account of "an extraneous offense" since it bore "no relation to this particular offense." We will place the challenged arrest in its factual setting, drawing on testimony taken at a midtrial hearing.[1]

A rather remarkable bit of investigative work on the next day after the homicide by McLennan County Deputy Sheriff Edward Torres led him to a construction job site in Waco and a personal conversation with an uncle of appellant. Later that relative called Deputy Torres from Lampasas and informed him that appellant and his cousin were in Lampasas and asked if Torres still wanted to talk to them; when Torres affirmed that he did, the uncle said he would drive them to Waco promptly.[2]

All agree that when appellant and his cousin, Ted Ryan, were brought to his office by Ryan's father, Torres made clear that they had not been charged with any offense, that they did not have to talk if they did not want to, but since he was investigating the death of a friend of theirs, he needed to talk to them. According to Torres both were also given an "investigation warning" by a local magistrate, and a copy thereof in the record reflects such a warning being given at 6:35 p.m. January 30, 1980. Content of the conversation that followed was not developed by the State, but after it was concluded on a seemingly

---

1. Both initial counsel and substituted counsel for appellant had filed motions to suppress his confession, premised respectively on an "illegal arrest" and a "warrantless arrest." When the latter called the motion during a pretrial hearing the judge of the trial court informed him of local procedure:

    "Well, your *Jackson-Denno* and Motion to Suppress . . . our procedure here . . . is that at the time those are offered, or intended to be offered, then we excuse our jury and go into it. The reason for that being, that the witnesses are here, at that time, and the witnesses do not have to make two trips. That's the why of that, and that's our procedure, and there is no problem on that."

Of course, as we shall see the problem now confronting this Court may have resolved itself had it been ventilated through a pretrial hearing.

2. Appellant testified at the *Jackson v. Denno* hearing that he, himself, had a telephone conversation with Torres during which he asked if he was going to be placed under arrest when he got to Waco, and that Torres replied that "they didn't have anything to arrest me for, and the offense that he was wanting to talk to me about, if I didn't have anything to worry about at all, I wouldn't be arrested." Deputy Torres did not deny that account when recalled by the State on rebuttal.

unproductive note, Ryan was allowed to go, whereas appellant was arrested, detained and jailed on "a warrant sent to us from Lampasas"[3] said to be for the offense of misdemeanor theft. The confession appellant sees as tainted by that arrest was obtained about twenty nine hours later, at approximately midnight January 31, 1980, and *post* we have more to say about intervening events.

The problem presented at this point is that neither party ever produced the Lampasas County warrant with a supporting affidavit, if any. When it became apparent that it constituted the only basis for arresting him, appellant objected to any further testimony by Deputy Torres or admission of any statement

> "on the grounds that the affidavit and warrant on which [appellant] was held has not been produced in Court... We challenge the very existence of any warrant, unless produced ... in this Court. And we're relying on *Cannady v. State,* 582 S.W.2d 467. Therefore, the arrest was illegal, and any subsequent statement given by appellant is the fruit of a poisonous tree."

The prosecutor took the position that once it is shown to be a voluntary statement it is admissible "regardless of the legality of the arrest, so long as the statement is not a result of the arrest." Whereupon the trial court overruled appellant's objection.

Though ultimately the State's position is incorrect, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Green v. State,* 615 S.W.2d 700 (Tex.Cr.App.1980), the threshold question is which party was charged with producing the warrant and getting it in the record for purposes of appellate determination of validity of arrest of appellant pursuant to the warrant. Both rely on selective portions of the *Cannady* opinion, as did the Court of Appeals. However, strictly viewed, *Cannady* is not con-

trolling for either party since it involves a search warrant. Still, the rules reiterated there may well be applicable to seizure of the person purportedly made under an arrest warrant that leads to a confession, in that principles of the Fourth Amendment to the United States Constitution and of Article I, § 9, Bill of Rights in the Texas Constitution are thereby implicated. *Taylor v. Alabama,* 457 U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); see *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

It is axiomatic that like a search of the person without a warrant, subject to well delineated exceptions not applicable here,[4] a warrantless arrest is constitutionally and statutorily prohibited. Fourth Amendment; *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Taylor v. Alabama,* supra; Article I, § 9; Article 1.06, V.A.C.C.P.; *Heath v. Boyd,* 141 Tex. 569, 175 S.W.2d 214 (1943).

█ When an arrest is thus challenged that the burden falls on the State to justify the arrest and its consequences is the lesson taught by too many leading decisions that have dealt with the issue, e.g., *Whiteley v. Warden,* supra, 401 U.S. at 570, 91 S.Ct. at 1038; *Brown v. Illinois,* supra, 422 U.S. at 604–605, 95 S.Ct. at 2262; *Dowdy v. State,* 534 S.W.2d 336, 339 (Tex.Cr.App.1976). When that justification is authority by warrant, implicit in the opinions of such cases as *Haynes v. State,* 468 S.W.2d 375 (Tex.Cr. App.1971) is that the purported warrant must be produced for inspection of the trial court for a determination of its sufficiency, as was done there, *id.,* at 378:

> "The records reflect that the four felony arrest warrants were introduced into evidence. They are valid on their faces."

See also *Dusek v. State,* 467 S.W.2d 270 (Tex.Cr.App.1971), in which a stipulation

---

**3.** Deputy Torres later elaborated that he knew to hold appellant "[b]ecause they handed the warrant over to me, told me that he was wanted by Lampasas and that a warrant was sent to our office to hold him by." He also related that, when appellant was actually placed in custody, Torres had the warrant in his possession.

**4.** The State does not claim any exception such as provided by Articles 14.01, 14.02, 14.03, 14.-04 and 18.16, V.A.C.C.P.

was substituted for three of four original warrants and the fourth was an exhibit, thus satisfying a contention that "before the officers testified as to the arrest and search" the State was required to present the warrants for inspection by the court, *id.*, at 271. The Court noted that the authorities relied on by the appellant to support his contention dealt with a search rather than an arrest warrant, but did not suggest they are inapposite.

■ Accordingly, we find there is no principled reason to distinguish between a search and an arrest in applying the rules restated in *Cannady v. State,* supra. Therefore, we hold that when an accused objects to admission of evidence on the ground that it is tainted by a warrantless arrest and the State relies on an arrest warrant, in the absence of waiver, reviewable error will result unless the record reflects that the arrest warrant was exhibited to the trial judge for a ruling. *Cannady,* supra, at 469. Unlike the record in *Cannady,* there is no showing in the record before the Court that the purported Lampasas County arrest warrant was ever exhibited to the trial judge. Thus, the corollary rule—that if appellant desires an appellate review of the warrant and supporting affidavit, if any, he must offer a copy thereof for the record—never came into play in the case at bar. Appellant's objection to validity of his arrest should have been sustained. See *Vines v. State,* 397 S.W.2d 868 (Tex.Cr.App.1966) and *Skiles v. State,* 109 Tex.Cr.R. 6, 2 S.W.2d 436 (1928), two of several authorities cited by the Court in *Cannady.*

Having found that the trial court erred in that respect means only that we must now examine the circumstances surrounding acquisition of a written confession from appellant in the light of his being held in jail on an arrest not shown to be lawful *Green*

*v. State,* supra; *Dowdy v. State,* supra, at 339. The key factors to be examined in light of the evidence are those set forth in *Brown v. Illinois,* supra.

After Torres allowed cousin Ted Ryan to leave, the nineteen year old appellant was booked into the McLennan County Jail on the Lampasas County warrant. But Torres merely "believed" that appellant was warned by a magistrate concerning that charge—we have no written warning in the record.[5] Nor does it appear that proceedings mandated and contemplated by Articles 15.18 and 15.19, V.A.C.C.P. were held.[6]

At some point during their discussion on Wednesday evening, January 30, Torres had asked appellant if he would object to "going on a polygraph;" since the latter did not, the next day, Thursday, Torres removed appellant from the McLennan County Jail and took him to a DPS polygraph operator in Waco. At completion of the examination the operator told appellant and Torres that appellant "knew more than he was saying" about the murder under investigation. Returning to the McLennan County Jail, Torres told appellant, "I probably would [want to talk to him some more]," and, according to Torres, appellant said that "he had something to tell me anyway." However, Torres replied that since it was late in the evening for appellant to "go upstairs to his cell and get some rest and get something to eat," and Torres would talk to him later.

The record, primarily testimony of Torres, is far from clear about how he and other officers came to converse with appellant again. It appears that about 11:00 p.m. Thursday night Torres "went up and talked to him again" after warning him, and at that point appellant "told me what he had done." Torres "brought [appellant] downstairs" and before the confession in

5. The magistrate who had given an "investigation warning" at 6:35 p.m. testified that he did not recall again warning appellant with respect to the misdemeanor charge from Lampasas.

6. Article 15.18, supra, provides that one arrested under a warrant issued in another county "*shall* be taken before a magistrate of the county where the arrest takes place who *shall* take

bail, if allowed by law..." Only "if the accused fails or refuses to give bail...," does Article 15.19, supra, authorize his being committed to jail in the county where he was arrested. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

question was reduced to writing somehow, somewhere "caused [appellant] to be warned" by the same magistrate that had given the "investigation warning" on Wednesday. (Though both parties referred to a State's Exhibit No. 12 being dated January 31, with "murder" being handwritten "at the bottom of it," and a time of "11:50 p.m.," that exhibit is not in the record before us, and the confession itself recites only that appellant had been warned by the magistrate "at 6:35 p.m. . . . on the 30 day of January, 1980"—in other words when the "investigation warning" had been given.)

Thereafter, as we understand it, appellant started talking about events leading up to the killing and a police record secretary attempted to write it down in longhand, but when appellant became dissatisfied with that procedure he volunteered to and did proceed to write the rest of his statement in his own words—consuming three and a half legal size pages. His own statement was then typed on the standard confession form alluded to above. The latter concludes: "Furthermore if one word is ~~damaged~~, [sic] added to or taken from this statement; I will completely retract every word." We observe that the typed version is faithful to what appellant wrote in his own hand, revealing meticulous details of events and occurrences before, leading up to, during and after the deceased was literally assassinated by appellant—exonerating entirely his cousin, Ted Ryan.

█ We find the taint of the presumptively illegal arrest of appellant at the

McLennan County Jail, though not purged alone by *Miranda* warnings, *Brown v. Illinois,* supra, 422 U.S. at 601–602, 95 S.Ct. at 2260–2261, was removed by the time and circumstances under which the confession was ultimately given. Thus, there could be no doubt of the purpose of his being driven by his uncle, along with his cousin, from Lampasas to McLennan County Sheriff's Office. Though he may well have been surprised at being held on the Lampasas County warrant while Ryan was released to return to Lampasas, he willingly agreed to submit to a polygraph examination concerning his implication in the murder of a friend. As a practical matter, then, that Torres failed to take appellant before a magistrate for fixing of bail with respect to the outstanding misdemeanor theft charge pending in Lampasas is not particularly flagrant misconduct. Overnight and, so far as appears, well into the Thursday, though still confined, appellant was not interrogated, and he did not remark about any particular event occurring in the interim. The agreed visit to the polygraph operator and his test seem routine, and while no doubt troubled by the conclusion that he "knew more than he was saying," appellant was not subjected to followup questioning about that. Torres even declined an opportunity to inquire what it was that appellant had to tell him, suggesting that appellant first eat and refresh himself. Later, after Torres returned and again warned him, appellant simply told Torres what he had done.[7] Shortly thereafter, appellant was writing out in his own hand an expansive account of the entire episode.[8]

---

**7.** Appellant did not directly contradict Torres on this point. Rather, his version was that he was brought down from jail to an office where there were a Lt. Phillips, Deputy Thorn, as well as Torres, when Lt. Phillips began to play the "heavy" role. According to appellant, Phillips said, "You failed the polygraph test miserably and we're going to charge you with murder," and asked, "Do you want to talk?" Appellant responded, "I guess," and after all sat down Phillips "started talking to me, trying to, you know, tell me that I should tell him what happened." Then, appellant responded, "Well, I think I need a lawyer," and Phillips rejoined, "Don't worry, you will get a lawyer. Why don't you go ahead and make a statement on

this." There was further jousting in this vein and then Phillips "kind of, I should say, conned me into writing out the statement that I made."

While Phillips was not called to deny any statements attributed to him, Torres, who appellant conceded was present throughout and made no threats at all, testified on rebuttal that no such dialogue took place. As the judge of the trial court later observed with respect to the purported request for counsel, "It depends on who you believe." Obviously, he found appellant was not credible in this respect.

**8.** The dissenting opinion poses a question that seems to be central to its view of Fourth Amendment law applicable here: "[W]hat sig-

We conclude that his confession was not obtained by exploitation of an illegal arrest and that the trial court did not err in admitting it into evidence. *Dowdy v. State,* 534 S.W.2d 336, 339–340 (Tex.Cr.App.1976); cf. *Green v. State,* supra. Accordingly, for these reasons the fourth ground for review (Ground of Error Five in the Court of Appeals) is without merit.

As to the refusal of the trial court to excise from the confession appellant's recounting that on Monday, January 28, "I decided to go buy a pistol because I had been ripped off of some rare coins back in Lampasas by a couple of dudes and I was going to shoot them to get even with them," we first observe that appellant recanted part of the statement.[9] In any event we reject the rationale of the Court of Appeals: "The mere purchase of a gun with intent to shoot someone does not constitute an offense. There was not sufficient preparation. V.T.C.A. Penal Code, 15.01."

■ The rule appellant invokes is not limited to a completed accomplishment of all elements of a penal offense defined in the code. *Collins v. State,* 577 S.W.2d 236, 237 (Tex.Cr.App.1979). It also embraces proof of similar occurrences, other extraneous transactions and prior specific acts of misconduct. The reason is such matters are generally irrelevant to the contested material issues in the case on trial and, therefore, inadmissible. *Murphy v. State,* 587 S.W.2d 718, 721 (Tex.Cr.App.1979). An accused's "propensity to commit crimes" is not a material issue on the question of guilt with respect to the specific crime charged by the indictment, and using evidence showing only a propensity amounts to trying an accused as a "criminal generally," thereby offending our system of criminal justice. *Ibid.,* and cases cited therein. Like any other matter, admitting "evidence that is prejudicial and harmful and which has little or no relevance to any issue in the case generally requires reversal of the judgment," *Stanley v. State,* 606 S.W.2d 918, 919 (Tex.Cr.App.1980).

Once that kind of extraneous material is admitted not only may jurors immediately react adversely to the accused, but also there is potential for another vice: the offensive evidence becomes available to the prosecution for appropriation and exploitation almost at will.[10] In our best judgment

nificant intervening event or events or circumstances, *totally unrelated and unconnected with the illegal arrest,* occurred in this cause prior to the giving of the confession, that establishes that the confession is 'sufficiently an act of free will to purge the primary taint?'" With deference to that view, we fail to find anything in *Taylor v. Alabama,* supra, or in the decisions it expressly follows that requires whatever intervening matters be utterly without relationship to an illegal arrest. Rejecting a "but for" test in its seminal decision in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), what the Supreme Court has looked for are "intervening events [which] break the causal connection between the illegal arrest and the confession," *Brown v. Illinois,* supra, 422 U.S. at 602, 95 S.Ct. at 2261; *Taylor v. Alabama,* supra, 457 U.S. at ——, 102 S.Ct. at 2668. Appellant's willingness to take and his taking a polygraph test that failed to satisfy the examiner constitute "means sufficiently distinguishable to be purged of the primary taint" of a constructively illegal arrest. *Wong Sun,* 371 U.S. at 487–488, 83 S.Ct. at 417.

**9.** Testifying in his own behalf on direct examination appellant was asked and answered as follows:

"Q: Is that why you bought that gun?
A: I didn't have the intention of shooting at anybody when I bought it. I was going to take back the coins that had been stolen from me, though."
On crossexamination the prosecutor prefaced a series of questions with "I want to ask you some stuff about this statement" and, alluding to his direct testimony, proceeded to draw from appellant all the details about how "some people had ripped you off from some old coins."

**10.** In the case at bar, sensing an advantage gained with the unexcised declaration in evidence, the prosecutor went right to work on it in his final summation on the merits of his case. At the threshold he ruminated:
"They didn't just buy the guns, just to be buying guns. Each of them needed to be armed, for some reason. [If you say by your verdict not guilty] you can send him back to Lampasas. Hopefully, whatever he does with those two .25 automatics, then will be done in Lampasas County and not in this county, and it will be for another jury to worry about at some later date. . ."
And near the end he returned to that theme:
"I think you can use your common sense and read that confession, and from reading the

the trial court should have caused to be excised from his confession appellant's gratuitous explanation of his decision to buy a pistol, and thereby rendered inadmissible all the extracurricular testimony and jury argument about the matter. See *Clemons v. State,* 605 S.W.2d 567, 571 (Tex.Cr.App. 1980).

■ However, even though its admission be error and the evidence provided a good springboard for prosecutorial argument that was otherwise improper, we must still determine whether there is a reasonable possibility that admitting the single sentence into evidence "might have contributed to the conviction and the punishment imposed upon appellant by the jury." *Stanley v. State,* supra, at 920; *Clemons v. State,* supra, at 571.

Killing the deceased has already been characterized as an assassination. Now we let appellant's own words relate what he was willing to admit did happen, beginning just after he had decided to buy a pistol and get even with "a couple of dudes" in Lampasas.

"... This I did discuss with Roger [11] and Ted. This discision [sic] was my own. The three of us went into the pawn shop I first asked to look at a .25 Caliber automatic then I tried to buy it; but I had a New Mexico drivers [sic] license and he wouldn't sell it to me, because I needed a Texas drivers [sic] license. So Roger ... bought it for me using his driver's license. He also bought a box of shells for the gun (.25 auto). Roger said that he wanted to get his gun also, so we went to Copperas Cove, to the Action Pawn Shop on Highway 190 and there we picked up his .22 caliber magnum revolver. There we also bought another .25 caliber automatic exactly like the other one. That was bought for Ted.

We drove back to Waco and went back to Praco's Pawn Shop and bought a box of .22 caliber magnum shells for Roger.

Roger went in to get them for himself. * * * Next morning January 29, 1980 I received a letter from my mother, Roger wanted to know who it was from and I didn't tell him, so we argued about it and he got mad and left, and went walking down the road. Ted & I stayed in the room about another hour. At which time we left and went to the Contintental [sic] Cowboy, a bar, where we drank one beer each and left. Then we went to the WEstview [sic] Lounge, we stayed there untill [sic] about 4:00 P.M. Then we went back to the motel. Roger was there when we got back, and he was still mad because he wouldn't say anything. We started watching T.V. and fell asleep. When I woke up Roger was gone but he came back a few minutes later. He was still mad and wanted to know who the letter was from. I told him it was none of his business. He then said we had to get out of the hotel, and I told him that I was paying for it and he could get out. He was determined that Ted & I should leave. So I told him we would go to Lampasas. He said he wanted to go, and I told him he couldn't go with me, so he pulled his .22 magnum off of the end table and said that he was going. He was pointing the gun at me acting kinda strange. I was afraid he would shoot me so I said I would take him with us to Lampasas. At this time he calmed down and put the gun up, in the black leather holster and put it in the front of his pants, behind his belt. I then picked up my gun and put it behind my back in my belt and called Ted from the bathroom and told him to get everything ready so we could go. Roger was just standing by watching us get everything ready. I went out to get the truck warmed up and 1 or 2 minutes later Ted came out carrying our things and Roger walked out behind him. * * * I filled the truck with gas and bought a pack of beer. We left

confession, know that something ain't quite right and that you're not getting the whole truth. But you do what you have to do. And like I said, you put him out on the street, it's going to be for somebody in Lampasas to worry about next time, I guess."

11. Roger is the first name of the deceased.

Waco at this time heading west on Highway 84. As we were leaving Waco no one was saying anything. Shortly after we left town Roger started another argument about the letter. [sic] I had received. He said, 'You ain't worth a shit for not tellin me who wrote that letter' and he kept on, to the point that I felt threatened. I was afraid he would try to shoot me, because he had pulled the gun on me, and he knew I had a gun. I didn't say anything for a while and he kept on and cussing me. At this time we were all drinking a beer. I then reached back with my left hand and got my pistol and held it down on the outside of my left leg. I was driving, Ted was in the middle and Roger was by the passenger door. I held the gun by the side of my leg for about another minute and he was still mouthing off at me. He said, 'I don't have to stand for this shit from you, and I know how to stop it.' I then motioned with me [sic] head for Ted to sit back. Ted had not said anything up to this point. When he leaned back I put the gun in my right hand and took the steering wheel in my left [sic] I then reached over, pointed my pistol at the left side of Roger's head and fired. He leaned forward and grabbed his head, by putting his two hands on his forehead, and I reached over and fired another shot to about the same place. Ted asked repeatedly, 'What are you doing?' Not saying a word to Ted I pulled over and stopped the truck. I then told Ted to hold the brake which he did. I jumped out of the truck and ran around the front and pulled Roger out onto the ground. He was leaning towards Ted moaning. When he hit the ground I reached down and fired some more shots into the back of his head. My gun jammed so I tried to jack the shell out, so I

layed it on the seat and told Ted to give me his gun. He asked, 'Why, what are you going to do?' I picked up my gun again and pointin it at him I said 'Just give me the God Damn gun. [sic] So he did. I fired it twice, I think at the back of Roger's head while he still lay there, then got into the truck, gave back the gun and said, 'I think we better go.' We then went to Lampasas and spent the night. The next morning we took the guns to a sucluded [sic] spot and hid them. In closing, I would like to add that Ted Ryan had any part he may have played in it, forced upon him, by me. Futher [sic] more if one word is ~~damaged~~, added to or taken from this statement; [sic] I will completely retract every word. This is true and correct statement [sic] and did happen in McLennan County, Texas."

Testifying before the jury, appellant elaborated on several aspects of matters in his confession and stressed his sudden fear of Roger, but he never denied anything of significance.[12]

A forensic pathologist, who performed an autopsy on the body of the deceased, testified he found eight bullet wounds to the head, which he described before the jury.

"[T]here were two bullets, in-shoot wounds of the left ear, one actually through the ear, and the other through the flap of the ear, coming from the left to the right, going into the head. There was stippling by gunpowder around these wounds . . . which indicates that these two wounds were inflicted from a very close distance . . . probably only an inch or two away from the ear . . .

\* \* \* \* \* \*

There was also a total of six wounds roughly of the back of the head and the

---

12. He also revealed on direct examination that he was then on probation for felony possession of marihuana, had already violated conditions by being out of county and failing to report, knew that buying and possessing a handgun was violative of his probation and for those reasons was "scared" to "go to the police." On crossexamination he stayed with that position, discounting any thought that revocation

would follow on account of his killing Roger, in the following incredible exchange:

"A: Well, I didn't feel like—I didn't feel like what I did could be regarded as a crime. I don't want this to be taken wrong, but I don't know how else to say it.
Q: Well, you didn't think they were going to revoke your probation for it, then, did you?
A: No, sir. That was not my worry at all."

upper part of the neck. Three of these entered the cranial cavity, and three of them caused fractures of the skull, but the bullets were defected. * * * However, the initial direction of all six of these gunshot wounds to the back of the head is essentially the same, from back to front.

\* \* \* \* \* \* \*

There was, also, around some of these wounds to the back of the head, this same tattooing or stippling with gunpowder, indicating close range firing ... I would say a few inches."

We are completely satisfied that allowing the jury to know of the inadmissible single sentence in a three and a half page handwritten confession full of descriptive details of the admitted killing of Roger, the resultant testimony about his decision to buy a pistol and the otherwise improper argument of the prosecutor did not contribute to the conviction of appellant, nor had these matters been excluded would the case for the State on punishment have been significantly less persuasive.

For these reasons we agree with the result reached by the Court of Appeals, and affirm its judgment.

TEAGUE, Judge, dissenting.

The majority of this Court, after finding that the appellant timely and properly voiced his objection to the lack of a lawful arrest warrant, and that the State failed in its burden to produce one, see *Dusek v. State,* 467 S.W.2d 270 (Tex.Cr.App.1971); *Haynes v. State,* 468 S.W.2d 375 (Tex.Cr. App.1971); cf. *Gentry v. State,* 640 S.W.2d 899, 905–907 (Tex.Cr.App.1982) (Teague, J. dissenting opinion), holds that "Appellant's objection to validity of his arrest should have been sustained." The majority then proceeds to discuss the admissibility of the appellant's confession that was obtained subsequent to the appellant's arrest, and sustains the admission into evidence of the confession at appellant's trial.

Cited but not discussed in the majority opinion is the Supreme Court decision of

*Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), which was decided by the Supreme Court of the United States after the Waco Court of Appeals handed down its decision in this cause. The Supreme Court of the United States, on facts less favorable than here, held in *Taylor v. Alabama,* Id., that intervening events in that cause did not sufficiently break the causal connection between the illegal arrest and the giving of the confession by Omar Taylor, the defendant in that cause; thus, the intervening events and circumstances did not cure the illegality of the initial arrest.

The facts of *Taylor v. Alabama,* Id., as set out in the opinions of the Supreme Court of the United States and the Supreme Court of Alabama, see *Taylor v. State,* 399 So.2d 881 (Ala.1981), reflect that a robbery occurred at a grocery store located in Montgomery, Alabama. A suspect in the robbery, who was then incarcerated, informed the police that the defendant, Omar Taylor, was involved in the robbery. Police officers, acting on the "tip" from the incarcerated individual, arrested the defendant without a warrant. The defendant was told by the arresting officers why he was arrested. After being placed in a patrol vehicle, the defendant was given a legal warning. After arrival at the station house, the defendant was again given a legal warning. He was thereafter fingerprinted, questioned, and placed in a lineup. Police officers also told the defendant that his fingerprints matched unknown prints found on some items that had been handled by one of the participants in the robbery at the grocery store. A corporeal type lineup, held for purposes of identifying one or more of the robbers, proved unsuccessful. Based upon the fingerprint identification, a warrant for the defendant's arrest was obtained from a magistrate. The defendant was thereafter permitted to visit with his girlfriend and her male companion. Shortly thereafter, the defendant signed a waiver-of-rights form and executed a written confession. The Alabama Supreme Court, in holding that the confession was admissible, relied upon *Johnson v. Louisiana,* 406 U.S.

356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). In *Johnson v. Louisiana,* Id., the Supreme Court had held that where, prior to a line-up, the defendant was brought before a committing magistrate who advised him of his rights and set bail, the line-up was "sufficiently distinguishable to be purged of the primary taint" of an illegal arrest. *Id.* at 365, 92 S.Ct. at 1626. The Alabama Supreme Court held in *Taylor v. State,* supra, that the finding of probable cause which led to the issuance of the arrest warrant by a magistrate, "separated the arrest and confession of Omar Taylor [and] it would seem that the taint has been purged here as it was in Johnson," *Taylor v. State,* 399 So.2d at 885 (Ala.Sup.Ct.1981), and sustained the admission of the confession into evidence.

The Supreme Court of the United States, however, ruled in *Taylor v. Alabama,* supra, that Omar Taylor's confession was inadmissible as evidence and should not have been admitted into evidence at his trial. The Supreme Court first pointed out in its opinion, relying upon *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), that if a written confession was obtained subsequent to an illegal arrest, the confession was inadmissible as evidence and should be excluded "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" Factors used in making this determination are: "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." 457 U.S. at ———, 102 S.Ct. at 2667, 73 L.Ed.2d at 319. The Supreme Court also went to great pains to point out that giving the *Miranda* legal warning after an illegal arrest will not, standing alone, be sufficient to purge the taint of the illegal arrest. Further, as to the time gap between the arrest and the giving of the confession, which was a mere six hours, the Supreme Court held: "However, a difference of a few hours is not significant where, as here,

petitioner was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup." 457 U.S. at ———, 102 S.Ct. at 2668, 73 L.Ed.2d at 320. The fact that the defendant had visited with his girlfriend and her male companion prior to giving the confession was also held to be an insufficient intervening event to purge the taint of the illegal arrest. The fact that the police, after concluding that the defendant's fingerprints matched unknown prints found on items handled by one of the participants of the robbery at the grocery store, obtained a warrant from a magistrate before obtaining the confession was held to be "irrelevant to whether the confession was the fruit of the illegal arrest." 457 U.S. at ———, 102 S.Ct. at 2669, 73 L.Ed.2d at 321. As to flagrancy of police conduct, the Supreme Court stated: "The fact that the police did not physically abuse petitioner, or that the confession they obtained may have been 'voluntary' for purposes of the Fifth Amendment, does not cure the illegality of the initial arrest." The prosecution in *Taylor v. Alabama,* supra, also argued that the police officers in that cause had acted in "good faith." The Supreme Court made short shrift of that assertion by stating the following: "To date, we have not recognized such an exception, and we decline to do so here." The Supreme Court then held: "In sum, petitioner's confession was the fruit of his illegal arrest. . . ."

The majority of this Court, after "examining the circumstances surrounding acquisition of a written confession from appellant in the light of his being in jail on an arrest not shown to be lawful," concludes that "the taint of the presumptively illegal arrest of appellant at the Mc Lennan County Jail, though not purged alone by Miranda warnings . . . was removed by the time and circumstances under which the confession was ultimately given." The majority further concludes, without clearly delineating just exactly what purged the taint of the illegal arrest in this instance, that appellant's "confession was not tainted by exploitation of an illegal arrest and that the

trial court did not err in admitting it into evidence."

Appellant's counsel on appeal admits in her appellate brief that the confession was not obtained by coercion. She states the following: "However, appellant is not, by this ground of error, advancing the claim that his confession was coerced or that he was denied counsel. Rather he asserts that his statement was made as the result of confinement pursuant to the Lampasas County arrest warrant [which the majority in this cause holds cannot be used to establish the legality of the appellant's arrest] and his protracted contact with the Mc Lennan County personnel without benefit of consultation with family or attorney..." As I read this statement, counsel is contending that the appellant is relying solely on the failure of the State to establish intervening events and circumstances to remove the taint. of the initial illegal arrest, before the confession became admissible as evidence at appellant's trial.

On the other hand, the State argues that if there was an illegal arrest, the taint was purged because "appellant received his *Miranda* warnings not once, but numerous times prior to his signing the confession"; "the temporal proximity of the arrest and the confession was distant, the arrest on the Lampasas warrant having occurred in the early evening of January 30 ... and the confession being made sometime after 11:50 P.M. on the next date... Between the time of his initial contact with Officer Torres and his confession, appellant spent the night in jail, agreed to and took a polygraph examination away from the jail ..., and after returning to the Sheriff's Office, appellant informed Torres that 'he had something to tell [Torres] ... Appellant was allowed to rest and eat prior to the interview which led to the confession... Before taking the statement, appellant was again warned by a magistrate ... the record is replete with evidence of Deputy Torres's good faith, showing no evidence of wilful or a negligent deprivation of appellant's rights ... the impropriety of the arrest was not obvious, was not made for the purpose of obtaining a statement, was not exploited in any way to that end, was not without apparent justification, was not made as part of a dragnet operation or upon a pretext. Appellant was in no way misled as to the purpose of the arrest, nor was he subjected to continuous interrogation, threats, confusion, fright or surprise. No unacceptable police activity occurred ... the facts of the case show that the confession was 'purged of the primary taint', if any..."

I find that the State's argument, without mentioning the decision, patterns itself after the decision of the Supreme Court of Alabama in *Taylor v. State,* supra, which of course was the decision the Supreme Court of the United States reversed in *Taylor v. Alabama,* supra.

Interestingly, neither the appellant in his brief in support of the petition for discretionary review nor the State in its appellate brief nor in its response to the appellant's petition for discretionary review mentions or discusses *Taylor v. Alabama,* supra. As previously noted, the majority cites, but does not discuss *Taylor v. Alabama,* supra.

My reading of *Taylor v. Alabama,* supra, leads me to the conclusion that if there has been an illegal arrest, then it is incumbent upon the prosecution to present sufficient intervening events or circumstances that will cause a severance of any causal connection between the illegal arrest and the confession, so that the confession is "sufficiently an act of free will to purge the primary taint," *Taylor v. Alabama,* 457 U.S. at ——, 102 S.Ct. at 2667, 73 L.Ed.2d at 319, before the confession will be lawfully admissible. The giving of *Miranda* warnings to a person illegally arrested is insufficient to purge the taint. *Taylor v. Alabama,* supra; *Brown v. Illinois,* supra. In sum, where an appellate court is relying upon the intervening events and circumstances factor, as this Court is doing in this instance to sustain the admissibility of the confession, there must not be a causal connection between the confession and the illegal arrest. "It should be quite obvious that, once events are set in motion, there is, in terms of causation alone, no

place to stop. The event without millions of causes is simply inconceivable; and causation alone can provide no clue of any kind to singling out those which are to be held legally responsible." Prosser, *Handbook Of The Law Of Torts,* 4th Edition (1971), at 239.

In my view, the majority opinion simply does not square up with *Taylor v. Alabama,* supra, and, if anything, is in conflict therewith. I must ask the majority: what significant intervening event or events or circumstances, totally unrelated and unconnected with the illegal arrest, occurred in this cause prior to the giving of the confession, that establishes that the confession is "sufficiently an act of free will to purge the primary taint"? Neither the *Miranda* warnings that were given nor the good faith of the police will, by the explicit wording of *Taylor v. Alabama,* supra, get the job done.

I find that the majority, to support its holding that there were sufficient intervening circumstances, is left with the following events and circumstances: (1) After appellant was arrested and booked into the McLennan County Jail, Torres asked the appellant if he would object to taking a polygraph examination the next day; (2) the next day appellant took a polygraph examination but apparently was deceptive in his answers to questions asked by the operator, resulting in further non-testing questioning; (3) appellant was thereafter returned to the county jail, where Torres told him that he "probably would [want to talk to him some more]," with appellant responding that "he had something to tell [Torres] anyway." (4) Torres did not initiate any questioning at that time, suggesting instead "that appellant first eat and refresh himself." (5) No questioning of appellant occurred until later that night. (6) Without being summoned by the appellant, at a rather late hour, Torres went to appellant's cell, got the appellant and took him downstairs, where appellant thereafter gave a written confession. From these facts, the majority erroneously concludes that the written confession was validly obtained.

A careful observation of the above, in light of what the Supreme Court stated in *Taylor v. Alabama,* supra, will quickly cause any good faith or good intentions of Torres to dissipate and be without any legal meaning. Furthermore, Torres' concern about appellant's cleanliness and lack of nourishment reflects nothing more on the part of Torres than, before he addressed the appellant later near midnight, he did not want an unclean and hungry prisoner on his hands before attempting to obtain a confession from appellant, as such might have interfered with his "hope that something would turn up." 457 U.S. at ——, 102 S.Ct. at 2668, 73 L.Ed.2d at 319–320.

I have concluded that the majority, to sustain the admission into evidence of the appellant's confession, is really left with the bit about the polygraph examination as a sufficient intervening event and circumstance to purge the taint, but fails to explain how the taking of the polygraph examination, which reflected that appellant was deceptive in his answers to questions asked, could possibly have contributed to his ability to consider carefully and objectively his options and to exercise his free will in giving the written confession. The Supreme Court remarked in *Taylor v. Alabama,* supra, when it disposed of the prosecuting attorney's contention that the defendant's visit with his girlfriend and her male companion attenuated the taint: "If any [favorable] inference could be drawn [from that visit], it would be that this visit had just the opposite effect." 457 U.S. at ——, 102 S.Ct. at 2668, 73 L.Ed.2d at 320. Can less be said about appellant's visit with the polygraph machine?

If one strips the decisions of the Supreme Court, which are concerned with the admissibility of a confession where there has been an illegal arrest, of all their complicated ritualisms surrounded by elaborate trappings, I believe they will agree with me that a valid confession cannot be obtained by the police, with the possible exceptions of (1) where the defendant has been literally forced from the station house, but there-

after beats on the front door crying to be let back in so he can give the police a written confession or (2) where the police tell the defendant to leave the station house, but he refuses to leave the station house premises until he has been allowed to give a written confession. If either of those events occur, then maybe, just maybe, a confession that flows from an illegal arrest will be admissible. E.g., *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Perhaps the Supreme Court of the United States is unaware of how unsatisfactory its decisions are in this area of the law. However, I find that to continue to play the invisible-negative game of when such a confession is admissible, i.e., we will tell you what is wrong, but we will not tell you what should have been done, is totally unfair to members of police departments, as well as members of the Bench and Bar, and appellate courts. Hopefully, counsel for appellant will pursue this cause to the Supreme Court for a more definitive ruling in this area of the law, and the Supreme Court will expressly state what it has for so long implicitly held.

The majority has made an effort to sustain the admissibility of the appellant's confession. To such effort, I salute the majority. To its holding, however, which I believe will be short-lived in light of *Taylor v. Alabama,* supra, I respectfully dissent.

MILLER, J., joins.