**Charles Edmond SWEETEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 64087, 64088.**

Court of Criminal Appeals of Texas, En Banc.

April 18, 1984.

Robert R. Foster, Longview, on appeal only, for appellant.

Odis R. Hill, Dist. Atty., Longview, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

These are appeals from two murder convictions. The cases were consolidated and tried together. Punishment in each case was assessed at life imprisonment.

On January 9, 1979, officers from the Kilgore and Longview police departments were called to a homicide scene in Kilgore. Officers found the bodies of two white males, Mike Haase and Wally Parks, in the rear bedroom of a house. It appeared that both victims had died as a result of shotgun wounds. Under the body of Wally Parks, investigators found a handwritten note bearing the signature "Chuck." Investigators also found one shotgun shell at the homicide scene. One of the Longview police officers, Mike Maxey, recalled that on the previous day he had received a telephone call from appellant regarding the two victims. Maxey had been acquainted with appellant for over two years. During this telephone conversation, appellant had told Maxey that the two victims had burglarized his home. In addition, he had mentioned a shotgun. After recalling this telephone conversation, Maxey mentioned appellant's name as a possible suspect. Maxey and Joe Money of the Gregg County Sheriff's office proceeded to appellant's house in Longview. On the way, the officers called for three additional officers for backup.

When the group reached appellant's house, Maxey and Money knocked on the front door. Appellant's wife answered the door and invited the officers in. When they asked to speak to appellant, she led them into a bedroom where appellant was in the process of getting out of bed. When Officer Money entered the room, he noticed a shotgun hanging on the wall, some five to eight feet from appellant. When Money inquired of the appellant as to who owned the gun, appellant replied that it was his gun and it was loaded. Money took the shotgun down from the wall. Money also noticed a pistol lying in plain view on a closet shelf. The appellant also identified himself as the owner of the pistol, so Money seized it also. The officers asked if appellant would accompany them to the sheriff's office so they could talk and he voluntarily consented. When asked if they could take the shotgun and the pistol, appellant replied affirmatively. The officers unloaded the shotgun and Money put the three shells from the shotgun in his shirt pocket.

When appellant reached the sheriff's office at approximately 10:45 a.m., he was taken into an office where Billy Bryan of the Gregg County Sheriff's Office read appellant his Miranda rights and had him sign a waiver of rights form. Appellant and Bryan were joined by Money, Maxey and Marvin Avance of the Kilgore police department. The officers questioned appellant for approximately an hour as to his whereabouts the previous seventy-two hours. During this time, appellant told the officers that he and a friend had been target shooting on January 7 out on some rural property he owned. At the conclusion of this interrogation period, the officers contacted the district attorney's office which advised them they could hold appellant for investigation without filing charges. Appellant, although not formally arrested, was placed in jail. Later that day, the officers asked appellant if he would take them to his property where he had been target shooting. Appellant rode in the back seat with Avance, while Money and Bryan rode in the front seat. All the officers were armed with pistols and Money brought along the shotgun obtained from appellant. When they got to the farm, the officers found some .12 gauge shotgun shell hulls on the ground. These hulls were similar to the shells the officers had taken from appellant's gun and also similar to the hull found at the murder scene. At one point during the visit to the farm, Officer Money reloaded appellant's shotgun with one of the shells previously removed from it and fired it into a pine tree for the purpose of retrieving an empty hull for use in a ballistics test.

The appellant was then taken back to the Gregg County Courthouse and placed in

jail. At approximately 8:00 o'clock that evening, appellant was again removed from his cell and taken to the district attorney's office. Appellant was again advised of his Miranda rights and then questioned for a two-hour period by Money, Maxey and the district attorney. At the end of this interview, appellant agreed to take a polygraph examination the next morning in Tyler. Appellant was taken back to his jail cell where he spent the night.

The next morning at 7:30 a.m. appellant was driven to Tyler by Money and Maxey. When they reached Tyler, appellant was given a pre-test interview by the polygraph examiner. At the conclusion of this interview, appellant informed the examiner that he did not want to take the polygraph exam but he did want to talk with Mike Maxey. When appellant was alone with Maxey, he admitted committing the murders. At the same time Maxey was talking to appellant, Money learned that the ballistics test had come back positive on appellant's shotgun. Appellant was then formally arrested and taken back to Longview where he was taken before a magistrate. The magistrate advised appellant of his rights and arraigned him on the two charges. Appellant was then taken to the district attorney's office where he began giving a written statement at approximately 12:15 p.m. Appellant signed the statement at 2:00 p.m. on January 10, 1979.

■ Appellant argues on appeal that the trial court erred in admitting his confession into evidence because his confession was the product of an illegal arrest and detention. The record is clear that appellant was not formally arrested until he told Mike Maxey in Tyler that he had committed the murders. Officer Money testified that up until that time he did not feel he had probable cause to arrest appellant. Nevertheless, the record is clear that from the first time appellant was placed in the Gregg County jail at approximately 12:00 p.m. on January 9, 1979, he was in custody. Although the facts known to the officers at that point might have raised suspicions concerning appellant, they certainly did not

constitute probable cause. Thus, this investigative detention was clearly improper and amounted to an illegal arrest. See, *Ussery v. State*, 651 S.W.2d 767 (Tex.Cr. App.1983), and cases cited therein.

■ Probable cause did arise, however, on the morning of January 10, 1979, when appellant admitted to Maxey that he had committed the double murders and Officer Money learned that the ballistics test on appellant's shotgun was positive. The existence of probable cause at this point in time, however, does not negate the illegality of appellant's prior detention. It is important, though, in determining whether appellant's confession was the fruit of the illegal detention.

■ A confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Townsley v. State*, 652 S.W.2d 791 (Tex.Cr.App.1983); *Duncan v. State*, 639 S.W.2d 314 (Tex.Cr.App.1982); *Green v. State*, 615 S.W.2d 700 (Tex.Cr.App.1981).

■ In *Brown v. Illinois*, supra, the Supreme Court set out four factors which must be used in analyzing whether the confession was an act of free will. First, the reviewing court must look to see if *Miranda* warnings were given. The Court in *Brown v. Illinois*, supra, made clear that these warnings alone are not sufficient in and of themselves to purge the taint of an illegal arrest. However, they must be considered. Here, it is clear that *Miranda* warnings were given to appellant before each session of interrogation began. The second factor is the proximity of the confession to the arrest. In the instant case, appellant confessed approximately twenty-four hours after he was first put in jail.

The third factor is the purpose and flagrancy of the primary illegality. Just as in *Townsley v. State*, supra, the law enforcement officers in the instant case held appellant in custody even when they knew they did not have probable cause to arrest him. This was a flagrant violation of appellant's Fourth Amendment rights. The last factor, and probably the most important, is the presence of intervening circumstances.

The State argues that there was no taint —first, because the appellant did not offer testimony that he felt compelled to give a statement because of the prior detention; second, because appellant admitted that during the interrogation on the evening of January 9 the district attorney told him that if he wanted to stop the questioning all he had to do was get up and walk out of the office; and third, because the appellant voluntarily agreed to take the polygraph examination.

■ To answer the State's first contention, we look at *Brown v. Illinois*, supra:

The exclusionary rule thus was applied in Wong Sun *primarily* to protect Fourth Amendment rights. Protection of the Fifth Amendment right against self-incrimination was not the Court's paramount concern there. To the extent that the question whether Toy's statement was voluntary was considered, it was only to judge whether it 'was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.' [Citations omitted] * * * Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' [Citations omitted] Wong Sun thus mandates consideration of a statement's admissibility in light of the distinct policies and interest of the Fourth Amendment."

(Emphasis in original). *Brown v. Illinois*, 422 U.S. at 599, 601, 95 S.Ct. at 2259, 2260, 45 L.Ed.2d 416.

As to the State's second contention, the record shows that even though appellant testified on cross-examination that the district attorney told him he could get up and leave if he wanted to stop the questioning, on redirect appellant testified that he felt he was under arrest from the point when the officers first came to his house. Appellant testified he did not feel the officers would have let him go home at any time after that. Furthermore, several of the officers testified that although appellant was not under "formal arrest", they were holding him with the intention of keeping him at the courthouse.

Finally, the fact that appellant voluntarily consented to take a polygraph examination is not itself sufficient to remove the taint of an illegal detention. This case can be distinguished from the situation in *Gant v. State*, 649 S.W.2d 30 (Tex.Cr.App.1983). In *Gant*, this Court found that Gant's confession was not obtained by exploitation of Gant's illegal arrest. The Court noted that Gant voluntarily accompanied two relatives to the McLennan County Sheriff's Office for the sole purpose of talking with authorities about a homicide. Though Gant was held in jail overnight, he was not interrogated and he routinely agreed to take a polygraph examination. At the conclusion of the examination, even though it revealed that Gant "knew more than he was saying", Gant was not interrogated further but was left alone to rest and eat. It was after this that Gant told police what he had done and even proceeded to write his confession out in his own handwriting because the police secretary was so slow.

In the instant case, the circumstances surrounding appellant's confession were not as free from interference and taint as those surrounding Gant's confession. Appellant was not left alone as was Gant. Appellant was subjected to varied periods of interrogation. At one point, appellant was driven to a rural setting, accompanied by three armed officers. The record clear-

ly allows the reader to infer that appellant was in fear of his life at this point. The record before us shows a concentrated effort on the part of the State to extract a confession from appellant, even though the officers involved knew they were holding appellant without probable cause. This is precisely the situation which the Supreme Court in *Brown v. Illinois,* supra, was trying to prevent. Unlike the situation in *Gant,* the State in the instant case has failed to meet its burden of showing intervening events that may have broken the connection between appellant's illegal arrest and confession.

The judgments are reversed and remanded.