

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| EDDIE ESTEP, | § | 08-19-00280-CR |
| Appellant, | § | Appeal from the 205th District Court |
| v. | § | of El Paso County, Texas |
| THE STATE OF TEXAS, | § | (TC# 20150D04089) |
| Appellee. | § | |

**O P I N I O N**

An El Paso County jury convicted Appellant Eddie Estep of murder, sentenced him to life imprisonment, and fined him $10,000. On appeal, he presents twenty-three issues challenging his conviction.[1] Reordering the issues, we first address those providing the greatest relief.[2] Three of

---

[1] When grouped by their commonality, Appellant's twenty-three issues on appeal address the following seven topics: (1) challenges brought against the trial court's ruling on Appellant's pretrial motion to suppression evidence (Issues One through Four); (2) challenges brought against the trial court's rulings regarding an exhibit lost after trial but later replaced with a substitute (Issues Five through Seven); (3) challenges brought against the legal sufficiency of the evidence to support a conviction for murder (Issues Eight through Ten); (4) challenges brought against the trial court's rulings on Appellant's motion for mistrial and motion for new trial based on allegations of misconduct during jury deliberations (Issues Eleven and Twelve); (5) challenges brought against other trial court rulings pertaining to Appellant's motion for new trial (Issues Thirteen through Fifteen); (6) challenges brought against evidentiary rulings made during trial (Issues Sixteen through Twenty-Two); and (7) a final challenge asserting the cumulative effect of the errors violated Appellant's due process right to a fair trial (Issue Twenty-Three).

[2] *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010) (when raised, the legal sufficiency of the evidence must be addressed before trial error because sustaining it results in acquittal and "would interpose a jeopardy

the twenty-three issues assert the evidence at trial was legally insufficient to support Appellant's conviction for murder. If sustained, these issues would entitle Appellant to an acquittal. On review, we overrule these issues and hold the evidence is legally sufficient. Four issues next assert the trial court committed constitutional error by denying Appellant's pretrial motion to suppress evidence. And in two of those issues, Appellant sought to suppress a video-recorded statement—and physical evidence related thereto—on the basis that the evidence was obtained as the "fruit of an unlawful warrantless arrest." The other two suppression issues contend his recorded statement was made involuntarily. We sustain Appellant's first and second issue and hold the trial court erred in failing to suppress evidence on the first basis, that is, that the evidence was obtained as the fruit of an unlawful arrest. Because our resolution of those two issues results in a reversal of the trial court's judgment, we do not reach the remaining issues. Accordingly, we reverse the trial court's judgment and remand the case for further proceedings.

## I.  BACKGROUND[3]

*Initial medical treatment and hospitalization*

On June 7, 2015, at ten o'clock in the morning, firefighter-EMTs of the El Paso Fire Department were dispatched to a medical emergency at a Howdy's store located at the corner of Airway and Gateway West in El Paso. A 911 caller had reported an unresponsive person needing assistance at the location. Firefighters Peter Kazhe, Xavier Romero, and Lieutenant Pedro Fabela

---

bar to retrial"); *Rains v. State*, 604 S.W.2d 118, 120 (Tex. Crim. App. 1980) (noting the sufficiency ground would entitle the appellant to a judgment of acquittal rather than a new trial).

[3] In our recitation of relevant background facts, we include a review of all the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ("In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict . . . ."). In reviewing the issues involving the trial court's decision on the motion to suppress, we only consider evidence adduced at the suppression hearing. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex. Crim. App. 1996); *White v. State*, 201 S.W.3d 233, 239 (Tex. App.—Fort Worth 2006, pet. ref'd).

responded to the call.

Arriving on scene, firefighter Kazhe recognized a gentleman he had seen the day before walking out of the convenience store. When the lieutenant asked him a question, the gentleman pointed to an area somewhat behind him saying, "there's somebody over there." Kazhe then saw what looked like a person laying on the ground, curled up in a blanket. When Kazhe turned the person over to render aid, he recognized it was a woman he had also seen the day before. At the time, she was panhandling for money, holding a sign, and the gentleman who had exited the store was sitting nearby. The two of them had appeared homeless, which he soon confirmed. Kazhe identified the gentleman as Appellant, and further testified that, on scene, Appellant identified the woman as Tonya Brewer.

Kazhe testified the firefighters found Brewer was warm to the touch, smelled of alcohol, appeared to be struggling to breathe, and did not respond to their attempts to wake her. The rescuers testified they neither observed nor made note of any traumatic injuries to Brewer's body, including her face or head. While they worked on Brewer, Appellant approached and provided information including that Brewer was his girlfriend. Appellant denied that Brewer had consumed any drugs but he mentioned she was an alcoholic. He also mentioned they had met two gentlemen the night before and they were all partying. Based on their on scene assessment of Brewer's condition, Fabela testified he was "thinking a heat-related emergency," or maybe "some kind of intoxication."

An ambulance soon arrived to transport Brewer to University Medical Center (UMC) as a Level 1 medical patient. The ambulance record signed by EMT Ernesto Saenz included the following narrative:

> 39 [year old female patient] is a homeless female, male friend on scene states 'she drinks heavily' states possible epilepsy hx unknown other hx, states she was this

3

way since last night, that he wasn't able to wake her up, states this morning she 'has been this way' unresponsive and he can't wake her up. [patient] is supine on ground, with snoring respirations tolerated nasal, . . . suspect heat stroke. [patient] had been treated with iv and 2 mg narcan by q-20, no response, pupils are at 4 mm, resp rate at 20 and snoring, no head trauma noted. [patient] immobilized. due to heat stroke suspected, exposed, iv ran w/o [patient] cooled down enroute with n/s to cool her down using wet towels. temp at hospital at 104 degrees f post some cooling. continued with a gcs of 3. C-3 L-1 medical. No incident. 2 ff from q-20 assisting.

On arrival at UMC, the emergency documentation notes that Brewer was found down for an unknown amount of time, unknown medical history, brought in by EMS, no known witnesses to events, and no seizure activity observed by EMS.[4] On physical exam, the emergency physician noted, "no obvious trauma other than a few mild abrasions." Brewer moved her extremities and withdrew to pain when she first arrived. Due to her altered mental status, the treating physician ordered a CT scan of the brain, which revealed a presumed traumatic subdural hematoma, hemorrhage, and herniation. A surgeon performed an emergent craniotomy.[5] Following surgery, Brewer remained comatose, she was ventilator dependent, and the medical staff had concerns about her prognosis. On June 10, 2015, at 3:05 p.m., she was pronounced brain dead by attending physicians.

*The investigation*

Days before Brewer's death was pronounced, UMC assigned a social worker to locate her

---

[4] The medical records specified, "[t]he patient is a 39-year-old woman who start[ed] having symptoms over 12 hours prior to presentation [] but went to sleep at the homeless shelter and was not able to arouse her the next morning." This narrative is repeated throughout these records, stating roommates in the homeless shelter stated she was lethargic the day before. Records also note Brewer was found unresponsive "by a friend." Other than these records, we noted no other evidence was presented at trial referencing an event at a homeless shelter or Brewer's reported "symptoms."

[5] Testimony of medical examiner, Mario Rascon, M.D., described a craniotomy as 'an incision through the scalp, exposing the bone and then drilling some hole in the skull. It may or may not include removing fragments of the skull in order to, number one, evacuate. . . . [I]t can be done for a number of reasons. You need to do a craniotomy to take a tumor out, for example . . . to remove the bleeding and then subsequently, it can be done to alleviate the pressure that the brain is being subject to.'

4

family. Social Worker Laura Hemley met with Appellant at the hospital. In her report dated June 8, 2015, Hemley noted the following information: "[patient] is a [39-year-old] female who was found down, possibly assaulted or had fallen . . . [patient] and [Appellant] have been homeless together for the last few months and stay under the overpass at Airway and 1-10." Hemley's note further indicated that Appellant told her that Brewer had a daughter who she communicated with via Facebook. Hemley planned to research via the internet noting that Brewer's prognosis was very poor.

On June 10, 2015, UMC personnel notified the El Paso Police Department (EPPD) they were treating a female patient with severe head trauma who was possibly not likely to survive. Patrol Officer Moises Avila was assigned to proceed to UMC and assist officers at the hospital in reference to a subject who might have been visiting a patient. Arriving at 4:10 p.m., Officer Avila approached a nurse and she pointed out Appellant who was in the waiting room. Officer Avila asked for Appellant's name and date of birth to confirm his identity.

Avila's dispatch informed him that Appellant had an outstanding warrant in Oklahoma related to a driving-while-intoxicated offense and the warrant had been confirmed.[6] Avila arrested Appellant and transported him to the EPPD Crimes Against Persons office (CAP office). After turning Appellant over to CAP detectives at approximately 5:10 p.m., Avila worked on his arrest report on an office computer. At approximately 6:20 p.m., Avila received paperwork from dispatch stating that, while Appellant's warrant remained valid, Oklahoma nonetheless reported it would not seek extradition. Fifteen minutes later, through a phone call with dispatch, Avila confirmed

---

[6] A "confirmation" means the warrant is valid and the agency wants to extradite on the warrant. The process to "confirm" the warrant requires Channel One to call or send a teletype to the agency issuing the warrant and ask whether the issuing agency intends to pick up the suspect.

5

the Oklahoma authorities did not want to extradite Appellant. At 6:40 or 6:45 p.m., Avila notified the EPPD CAP supervisor, "most likely Sergeant Cosack," of these circumstances.

EPPD CAP Detectives Ray Sanchez and Adrian Garcia, supervised by CAP supervisor Sergeant Cosack, interviewed Appellant on June 10. Garcia testified at the suppression hearing that Cosack briefed them about a female victim "who had severe head trauma and was possibly not going to make it" and that "patrol officers were with the boyfriend, possible boyfriend or the person who was last with" Brewer. Cosack also told Garcia that "[Appellant] had a warrant and he was placed under arrest for that warrant." Garcia claimed that he and Sanchez introduced themselves to Appellant sometime between 5:00 p.m. and 6:00 p.m. And that they conducted an unrecorded pre-interview discussion with Appellant sometime between 6:30 p.m. and 7:00 p.m. The recorded portion of the interview begins at 6:58 p.m. and shows Appellant alone in an interview room with his right wrist handcuffed to a chair. Detectives Sanchez and Garcia enter the room at almost exactly 7:00 p.m. Garcia then immediately exits the interview room for approximately twenty seconds before returning to read Appellant his *Miranda* warnings. Appellant acknowledged he understood his rights. He was not asked whether he wished to waive them. Garcia testified that at this point in time EPPD did not have probable cause to detain Appellant for a crime related to Brewer's injuries or death; he was only detained because of the Oklahoma warrant. Garcia and Avila both testified they did not have a legal basis to detain Appellant after it was discovered Oklahoma would not extradite him. But Garcia claims he and Sanchez did not know about Oklahoma's decision to not extradite Appellant until a break in the interview at 8:59 p.m.

In total, Appellant was interviewed for approximately three and a half hours. Sanchez and

Garcia kept him handcuffed to the chair for the first forty-four minutes. A little over an hour into the interview, they informed Appellant that Brewer had died from her injuries. During the interview, Appellant initially explained to the detectives that he and Brewer were drinking on the night of June 6, 2015, and he dropped Brewer a couple of times as he attempted to "get her home safe and lay her down." Appellant described their "home" as the area under a bridge, under the I-10 overpass. He described the route to get there involved going up a hill, going up concrete, climbing up rocks and moving through trenches. Appellant described they were both more drunk than they had been "in so long." Over the next several hours, the detectives explore alternative scenarios and repeatedly ask Appellant to tell them what happened that night. Appellant adds details to his retelling of what he remembered or what he could say had happened that night, including a statement that he saw people standing over him in the middle of the night and maybe they had assaulted Brewer. He then said Brewer was bothering him while he was trying to sleep, and he pushed her off him. Lastly, he described that he tackled Brewer and restrained her on the ground when she bothered him. Throughout the interview, Appellant claimed he could not clearly remember the night Brewer was injured because he was intoxicated, but that if he did hurt her, it was not intentional.

Garcia and Sanchez ended the initial interview at 9:59 p.m. Appellant, however, requested they continue to speak. After an approximately fifteen-minute break, Garcia again read Appellant his *Miranda* warnings. And again, Appellant acknowledged that he understood his rights; but he was not asked whether he wished to waive them. Appellant started this portion of the interview by restating that he did not intend to hurt Brewer: "I – I want it to be known that I didn't intentionally hurt her." Over the next several minutes he described how Brewer had physically assaulted him

7

numerous times. He then claimed that on the night before Brewer was found unresponsive "she came at [him]" while he was passed out from drinking. In response, he tackled her and restrained her to make her stop attacking him.

*Procedural Background*

A grand jury indicted Appellant with one count of murder and one count of aggravated assault with a deadly weapon against a person with whom Appellant was in a dating relationship. Appellant filed a motion to suppress his statements to law enforcement, which, after two evidentiary hearings, the trial court denied without findings of fact or conclusions of law. Appellant filed a motion to reconsider his motion to suppress before trial, which the trial court summarily denied, on the record, moments before the start of the jury trial.

Appellant's jury trial lasted six days. The State presented evidence through the testimony of fifteen witnesses and numerous exhibits. In its opening statement, the State told the jury that the strongest piece of evidence it had showing Appellant was guilty was "the statements the defendant gives himself." As a result, the jury watched the whole video (with redactions irrelevant to this appeal) of Appellant's June 10, 2015, statement to Sanchez and Garcia. It also received a transcript—again with irrelevant redactions—of the interview. And the State played and referred to Appellant's statement throughout most of its closing argument. In his case-in-chief, Appellant did not testify but he otherwise presented testimony from several witnesses to include two of the firefighters who arrived on scene to render aid to Brewer as well as from a legal psychology expert who testified on police interrogation techniques.

The jury found Appellant guilty of the murder charge but did not reach the aggravated

assault with a deadly weapon charge.[7] The jury assessed punishment as life imprisonment and a $10,000 fine, which the trial court imposed. Appellant filed a motion for new trial which, following a hearing, the trial court denied. This appeal followed.

While the appeal remained pending, the trial court issued written findings of fact and conclusions of law related to Appellant's motion to suppress.[8] In its findings of fact, the trial court found "the testimony of both Officer Avila and Detective Garcia to be credible." Consequently, it believed Avila's testimony wherein he stated he "informed a CAP supervisor that Oklahoma authorities would not be seeking extradition of [Appellant]" at approximately 6:40 or 6:45 p.m. The trial court also stated that when Detective Garcia started the interview at 7:00 p.m., "Detective Garcia had a subjective belief that the [Appellant] was under arrest for the Oklahoma warrant . . . ." It also found that EPPD CAP never explicitly told Appellant he was free to leave after it learned Oklahoma would not extradite him. Based on its findings of fact, the trial court made the following relevant conclusions of law:

1. After learning of and confirming the existence of the Oklahoma warrant, Officer Avila had probable cause to arrest the Defendant and transport him to EPPD Headquarters.

2. After learning and confirming that Oklahoma authorities would not pursue

---

[7] The Court Charge contained four different verdict forms: Count I (Murder), Verdict Form "A" ("not guilty"), and Verdict Form "B" ("guilty"); Count II (Aggravated Assault), Verdict Form "C" ("not guilty"), and Verdict Form "D" ("guilty"). During closing arguments, the State argued to the jury that deliberations "boil[ed] down to . . . which count is applicable in this particular case." As reflected by the foreperson's signature appearing on Verdict Form B, the jury answered guilty to Count I only. On October 7, 2019, in the case captioned The State of Texas v. Eddie Estep, Case No. 20150D4089 Count I of II, 205th District Court of El Paso County, Texas, the trial court rendered a "Judgment of Conviction by Jury," as to the offense of murder, and further noted the following orders apply: "JUDGE ABANDONED COUNT II."

[8] This appeal has been abated twice. First, after Appellant timely filed a notice of appeal and before the deadline to file the reporter's record, an exhibit admitted at trial went missing. We granted Appellant's motion to abate the appeal for the trial court to conduct a hearing on the missing record, which Appellant addresses in Issues Five through Seven. Following the hearing, the appeal was reinstated. Again, however, Appellant filed a motion to abate the appeal and remand the case to the trial court for findings of fact and conclusions of law regarding the motion to suppress, addressed in Issues One through Four. Once such findings and conclusions were filed, we reinstated the appeal.

extradition, the Oklahoma warrant was no longer a valid basis for the Defendant's continued detention.

3. Based on the injuries to Ms. Brewer and the Defendant's statements within the first several minutes of the recorded interview, additional probable cause was developed that an offense involving family violence had occurred to justify the detention of the Defendant. TEX. CODE CRIM. PRO. art. 14.03(a)(4).

4. Assuming that the Defendant's detention was unlawful between the time the El Paso Police Department collectively learned that Oklahoma authorities would not extradite the Defendant and additional probable cause was developed to detain the Defendant, the Court concludes that first video-recorded statement is sufficiently attenuated from any unlawful detention.

5. Other than temporal proximity, all of the factors articulated in *Brown v. Illinois*, 422 U.S. 590 (1975), weigh in favor of attenuation. The Defendant was warned of and voluntarily waived his *Miranda* warnings on video. The conduct of law enforcement both during the course of his arrest at the hospital and during the interview itself was not flagrant nor in bad-faith. During the interview, the Defendant was treated respectfully—he was asked for consent to provide a DNA sample and to search his belongings—and nearly all of his requests for bathroom breaks, coffee, and cigarettes were obliged. When Detective Garcia learned that Oklahoma authorities would not extradite the Defendant, he was informed and asked if he would continue to speak with the detectives. The questioning was not excessively or unduly aggressive or coercive.

6. The second interview is also sufficiently attenuated from any unlawful detention. The Court's analysis is essentially the same as noted above with the first interview, but with an even more significant intervening event—namely, the Defendant's explicit request to continue speaking with detectives.

Based on these findings and conclusions, the trial court ruled the video of Appellant's interview, and evidence related thereto, were admissible at trial.

## II. SUFFICIENCY OF THE EVIDENCE

We begin with Appellant's eighth, ninth, and tenth issues, which all challenge the sufficiency of the evidence. Appellant argues the evidence is legally insufficient to support the conviction because the State failed to prove he (1) intentionally committed an act clearly dangerous to human life that resulted in Brewer's death, (2) intended to cause serious bodily injury to Brewer,

10

and (3) did not act in self-defense if he did get into an altercation with Brewer. We address these issues collectively in determining whether the evidence was legally sufficient to support the jury's verdict. If any of these issues are sustained, Appellant would be entitled to an acquittal rather than a new trial. *See Rains*, 604 S.W.2d at 120.

**A. Standard of Review**

In a legal sufficiency challenge of a criminal conviction, we are required to review the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Fernandez v. State*, 621 S.W.3d 818, 826-27 (Tex. App.—El Paso 2021, pet. ref'd). We determine whether a rational juror could have found the essential elements of the crime beyond a reasonable doubt, based on the evidence and reasonable inferences. *Hooper*, 214 S.W.3d at 13. We give deference to "the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," but we may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *Jackson*, 443 U.S. at 318–19; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

For a sufficiency review, we look at those events occurring before, during, and after the commission of the offense and we may rely on those actions of the defendant that show an understanding to do the prohibited act. *Hooper*, 214 S.W.3d at 13. The cumulative force of all the incriminating circumstances must be sufficient to support the conviction, but each fact does not need to point directly and independently to appellant's guilt. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Circumstantial evidence, alone, can be sufficient to establish guilt as it is as probative as direct evidence in establishing guilt. *Hooper*, 214 S.W.3d at 13. We use the

11

same standard of review for both circumstantial and direct evidence cases. *Id*. The legal sufficiency of evidence is measured against the elements of the offense defined in the hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex. App.—El Paso 2009, no pet.) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

### B. Applicable law

A person commits murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(2). Murder is a result-oriented offense, whether committed intentionally or knowingly. TEX. PENAL CODE ANN. § 6.03(a); *Chaney v. State*, 314 S.W.3d 561, 567 (Tex. App.—Amarillo 2010, pet ref'd). Specifically, the State must establish the accused intended the result of death, or that the suspect was aware the conduct was reasonably certain to cause the result of death. TEX. PENAL CODE ANN. § 6.03(a); *Chaney*, 314 S.W.3d at 567.

Texas recognizes a general defense of justification to exclude criminal responsibility for otherwise criminal behavior. TEX. PENAL CODE ANN. § 9.31. "A person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary. . . to protect the actor against the other's use or attempted use of unlawful deadly force [.]" *Id*. § 9.32(a). The defendant has the burden to produce some evidence to support a claim of self-defense, and once the defendant produces some evidence of self-defense, the burden shifts to the State to prove the elements of the charged offense beyond a reasonable doubt and to persuade the jury the defendant did not act in self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594–95 (Tex. Crim. App. 2003). The burden of persuasion does not require the production of evidence but requires the State prove its case beyond a reasonable doubt. *Id*. Self-defense is a fact issue that

the jury is free to accept or reject. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). When the fact finder finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

### C. Analysis

Appellant contends, based on the evidence presented, there is insufficient evidence to support a finding that he committed an act clearly dangerous to human life and there was no evidence to support that Appellant intended to cause serious bodily injury to Brewer. Additionally, Appellant argues there was no evidence to support the jury's finding beyond a reasonable doubt that Appellant did not act in self-defense. We look to the evidence presented to the jury in the light most favorable to the verdict. *Jackson*, 443 U.S. at 319.

### 1. 911 call

The State played the recording of the 911 call made by a bystander. The bystander stated he was driving by and saw a "gentleman trying to revive a lady" but it appeared she was still passed out. The bystander clarified he saw a man appearing to tap on the woman while she was laying on her side but then walked away. The State argued to the jury that it was evidence of guilt that Appellant never called 911 or otherwise attempted to retrieve help for Brewer.

### 2. Testimony of store clerks

There was testimony from two former employees of the Howdy's store—David McCoy and Francisco Rosales—who testified that they believed Appellant and Brewer were in a romantic relationship for months prior to the incident. McCoy testified he did not see Appellant and Brewer come into the store together the week prior to the incident. McCoy did see Brewer come into the store alone, which he thought was unusual because her and Appellant were always together.

13

On the night of June 6, 2015, both McCoy and Rosales saw Appellant and Brewer come into the store individually, but never together. Rosales testified, at about 3:00 a.m., he witnessed Brewer appearing fearful, and Rosales proceeded to call the non-emergency police line. Also, after McCoy's shift ended around 9:30 p.m., him and Appellant talked outside the store. Appellant told McCoy he was afraid to succeed and improve himself. McCoy described Appellant as drunk and depressed. When McCoy told Appellant, he had to go and would see him tomorrow, Appellant replied "no, you won't." From McCoy's and Rosales's testimony, the State argued there was an inference that Appellant and Brewer had a conflict in their relationship on the night in question.

In contrast, the defense presented evidence that Brewer and Appellant were together and getting along with each other. The extraction of data from Brewer's cell phone showed photographs and videos of her with Appellant and she was smiling and seemingly having a good time together. The defense argued this evidence undercut the State's position asserting there was conflict between Appellant and Brewer.

### 3. Evidence of Appellant's various remarks and statements

The State's case focused on inconsistent and changing versions of events from Appellant's statements to others. Appellant argued his statements to various people were not inconsistent, but rather showed he did not actually know what happened to Brewer. The State presented the testimony of one of the first responders, Firefighter Kazhe, who testified that upon arrival, Appellant came out of the store holding a soda and walking nonchalantly. Kazhe testified that Appellant told them that he and Brewer were partying with two guys they had met the night before. Appellant decided to go to sleep and said Brewer kept bothering him to wake up and keep partying. Kazhe testified Appellant said, "Well I got tired and after a while, I just got up and I picked her up

14

and bodyslammed her to the ground and went back to sleep."

Countering, Appellant presented evidence that the other first responders, Xavier Romero and Pedro Favela, testified they did not hear Appellant make any statements about body-slamming Brewer. They testified such statements would require a report to police and noted trauma, which they did not do. The firefighter assessment entered into evidence notes no suspicion of assault as reason for Brewer's condition or otherwise mention an inculpatory remark made by Appellant. Specifically, the assessment notes "no trauma noted" to the head and face areas of Brewer and indicates the responders suspected she had suffered heat stroke.

Patricia Pavia, a visitor at the hospital, testified she interacted with Appellant while she visited a family member. Pavia testified that Appellant said Brewer was in the ICU for cirrhosis of the liver. She also testified that she witnessed Appellant having a stain on his shorts that she believed to be blood. She saw the stain on June 7, 2015, the first day she met him. A couple of days later, she saw Appellant wearing sweatpants. When detectives asked Appellant for the shorts, he told them he threw them away because he had soiled himself.

Laura Hemley, a social worker at UMC, testified she was assigned to Brewer's case to locate family members. In her statement given to police after Brewer's death, Hemley described that she met with Appellant on June 9, 2015, after learning he was visiting Brewer daily. When she asked Appellant what happened to Brewer, he told her that he and Brewer were both drunk, that Brewer slept next to him, but when he woke up, he noticed she was not next to him, and he could see two pairs of legs as if two persons were there with them. Hemley's statement further described that Appellant "made it sound like he was dreaming and he looked around and he could see Brewer in another area." A day later, on June 10, 2015, Appellant was looking for Hemley to

15

tell her he had found Brewer's two cell phones and he was excited to show her they were charging up. Hemley remarked that she thought he had told her that Brewer's stuff had been stolen. Appellant confirmed her stuff had been taken but the cell phones ended up in his bag. On the phone, Appellant then directed Hemley to the Facebook account of Brewer's daughter, Mahala Sexton. The medical records showed that Social Worker Hemley's statement to police did not match her notes taken while assigned to Brewer's case. Her notes summarize her attempts to contact Brewer's family based in part on information Appellant gave her about Brewer's family. Those notes otherwise do not include other statements by Appellant.

Next, Brewer's daughter, Mahala Sexton testified she would often communicate with Brewer through Facebook messenger. They would either communicate through written messages or video phone calls. Sexton testified she communicated with Brewer daily but she did not hear from her after June 6 and 7, 2015. On June 10, 2015, at 9:06 a.m. (MST), Sexton received a Facebook message from her mother's Facebook account. The message read:

> This is Eddie[.] I am having trouble with the wifi connection . . . [] I don't know who to contact other than you . . . [] I don't know how to say this to [] you it is very hard… [] but your Mom is in the hospital things aren't looking good we were attacked and robbed at our camp spot[.] I love her so much[.]

Shortly after receiving the message, UMC contacted Sexton to notify her that Brewer was in the hospital and she was told about her condition.

Additional to these witnesses, the State focused on the variations of events Appellant gave to the detectives. Appellant first told the detectives that he and Brewer were both drunk and he attempted to assist Brewer back to the area under the bridge where they slept, and in the attempt he dropped her a couple of times. Then, Appellant said he had a memory of people standing over him in the middle of the night and he thought someone had assaulted Brewer. Next, Appellant said

16

Brewer was bothering him while he was trying to sleep, and he pushed her off him. Lastly, Appellant said during a struggle, he tackled Brewer and restrained her on the ground. Appellant explained he was tired of being abused by Brewer, he tackled her, and hit her head on the ground. In its closing argument, the State focused on Appellant's differing statements to show that he was lying which demonstrated a consciousness of guilt.

### 4. Medical records

Through the medical examiner, the State also presented evidence of additional non-life-threatening injuries to Brewer's face and other areas of her body. There was DNA evidence showing a sample from a clump of hair found at the scene matched the DNA of Brewer and not Appellant. The swabs taken from under Brewer's right-hand fingernails contained a mixture of two individuals, matching the DNA of Brewer and Appellant. Also, both Brewer's and Appellant's DNA was present on Brewer's sweatpants. The DNA evidence from denture pieces found at the scene indicated a match to Brewer's DNA.

Lastly, the State introduced into evidence Brewer's medical records documenting the treatment she received at UMC. The initial intake notes at 11:06 a.m. that Brewer was brought in by EMS, unresponsive, hot to touch, with no abrasions or trauma seen. The ER physician noted she was minimally responsive, her skin was warm, dry, with minor abrasions to her hand and right flank, and her eyes did not open to pain. Based on a CT scan of her head, the ER note further describes Brewer having "severe traumatic brain injury." On June 8, 2015, she was taken into surgery for a craniotomy and evacuation of subdural hematoma. Brewer was pronounced brain dead two days afterwards. By the time the hospital contacted EPPD, Appellant had already talked with Hemley and messaged Sexton about her mother's condition. The medical records

occasionally mention Appellant being at Brewer's bedside.

The autopsy report of Brewer was also entered into evidence and the medical examiner who conducted the autopsy, Dr. Mario Rascon, testified to his examination of June 15, 2015. Dr. Rascon concluded that Brewer died of complications of blunt force injury of the head. From a medical standpoint, he testified he could not tell the jury how Brewer received her injury. But he confirmed the type of injury noted was consistent with circumstances such as being thrown to the ground, her head contacting asphalt, being hit with an unknown object, or a fall from standing height. He also described that Brewer undergoing a craniotomy had introduced more bleeding to the area of her head which he had also examined.

### 5. Physical evidence from Appellant

In addition to the DNA evidence taken from Appellant, mentioned above, the State introduced the contents from Appellant's backpack including a piece of paper and a paper towel with writing on each. On the piece of paper, the writing read:

> 'I just lost someone I care about so much to her, -- to her,  her thoughts, her feelings. Never had a chance at love. Praying for God above. Homeless, lifeless, a pigeon or a dove.'

The writing on the paper towel read:

> 'Don't run. You're f*cked. I'll run your face into the ground. Live in the dirt, worm food.'

Appellant claimed these writings were song lyrics for "metal" music.

### 6. Self-defense evidence

For Appellant's self-defense claim, the only mention of self-defense is from Appellant's video-recorded statement where, in his final version of events, Appellant claims he was passed out, he reacted, he was tired of being abused by Brewer while he slept, that "[i]t's kind of scary to

wake up that way." Otherwise, there was no evidence there was any struggle, altercation, or other confrontation between Appellant and Brewer to which a self-defense claim could be addressed. Additionally, there was no other evidence of a physically abusive relationship between the parties or any eyewitness testimony on an altercation between the two that night. There was no other evidence to show Appellant was permitted to use deadly force to protect himself.

By finding Appellant guilty, the jury implicitly rejected his self-defense theory, necessarily choosing not to believe statements he made which had suggested that if he had acted physically against Brewer, he only did so in self-defense. The jury did not have to accept Appellant's version of events under these circumstances. *Denman v. State*, 193 S.W.3d 129, 133 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("The jury did not have to accept appellant's self-defense theory— appellant's testimony does not 'prove,' by itself, a claim of self-defense.").

## 7. Sufficiency

Based on our review of the totality of the record, we conclude that a rational trier of fact could have rejected the self-defense theory and reasonably found the essential elements of murder were met beyond a reasonable doubt. Although the defense presented some conflicting evidence and alternative theories, we find the jury resolved conflicts and made credibility determinations in favor of the verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (finding that when the record supports conflicting inferences, an appellate court must presume the jury resolved the conflicts in favor of the verdict and defers to that determination in a legal sufficiency review).

Appellant complains there is "no evidence that would suggest that the manner in which any altercation occurred was such that it can be classified as an act clearly dangerous to human

19

life." But the jury presumably made the inference that Brewer received the blunt-force trauma from being tackled and hitting her head against the ground, and Dr. Rascon concluded the blunt-force trauma was the cause of her death. The jury's finding that Appellant's final version of events constituted Appellant committed an act clearly dangerous to human life is supported by the evidence. *See Gonzalez v. State*, No. 08-14-00293-CR, 2019 WL 1553583, at *8–9 (Tex. App.—El Paso Apr. 10, 2019, pet. ref'd) (not designated for publication) (finding a reasonable juror could have found that "undercutting" someone's feet causing them to fall on a hard-uneven surface was an act clearly dangerous to human life).

Appellant also argues there was no evidence that, if he did hurt Brewer, he did so intentionally. Appellant points to his statements to EPPD where he consistently mentions he never intended to do anything to hurt Brewer and if he did anything to hurt her it was unintentional. However, the jury was free to consider the circumstantial evidence that evidenced guilt such as Appellant failing to contact 911 or to get help for Brewer when he found she was unconscious, Appellant's inconsistent statements where he claims they were attacked but then changes his account claiming he dropped Brewer while carrying her, Appellant's eventual confession to tackling Brewer to the ground, and the evidence showing Brewer's injuries. The jury could have reasonably concluded that Appellant intended to cause serious bodily injury to Brewer in tackling her to the ground. *See Id*.

A reviewing court must not consider whether it is persuaded by the State's evidence; rather, the trier of fact is the sole judge of the credibility of the witnesses and the weight of the evidence. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex. Crim. App. 1984). When viewed together and in the light most favorable to the verdict, we conclude that a rational trier of fact could have

20

found beyond a reasonable doubt the elements of murder were met. Accordingly, we hold that the evidence was legally sufficient to support Appellant's conviction and we overrule his eighth, ninth, and tenth issues.

### III.   MOTION TO SUPPRESS EVIDENCE

We now turn to Appellant's issues challenging the trial court's ruling on the admissibility of the video-recorded statement, and physical evidence related thereto. In his first and second issues, Appellant asserts the trial court erred in denying his pretrial motion to suppress based on the evidence having been obtained as fruit of an unlawful arrest. Appellant's first issue contends the trial court erred in not suppressing his recorded statement. His second issue similarly argues the trial court erred in failing to suppress buccal swabs and other physical evidence obtained directly from Appellant or from his backpack. Appellant argues the evidence in question was obtained following an illegal arrest and by detectives continuing to hold him after they had learned that Oklahoma would not extradite on the warrant. He argues no good faith exception existed, the taint of the unlawful arrest was not sufficiently attenuated, and no additional probable cause existed to hold him at the time of questioning.

### A.  Standard of Review

We review a trial court's decision to deny a motion to suppress under a bifurcated standard. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). The denial of a motion to suppress is reviewed for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Saenz v. State*, 564 S.W.3d 469, 472 (Tex. App.—El Paso 2018, no pet.). We give almost total deference to a trial court's determination of historical facts but review questions of law *de novo*. *Carmouche*, 10 S.W.3d at 327; *Saenz*, 564 S.W.3d at 472. When the trial court makes

explicit fact-findings, as it did here, we determine whether the evidence supports the trial court's findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006).

**B. Fourth Amendment**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," but does not expressly preclude the use of evidence obtained in violation of its terms. *Herring v. U.S.*, 555 U.S. 135, 139 (2009). Nonetheless, both federal and Texas jurisprudence establish an exclusionary rule that generally precludes the use of direct or indirect evidence obtained following a violation of the Fourth Amendment. *Id.*; *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010). As a result, a "confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the casual connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Sweeten v. State*, 667 S.W.2d 779, 781 (Tex. Crim. App. 1984).

In *Brown v. Illinois*, 422 U.S. 590, 603 (1975), the United States Supreme Court outlined four factors for courts to consider in analyzing whether a statement given after an illegal arrest was an act of free will that is so attenuated from the illegal arrest to be untainted by police misconduct. *See also Sweeten*, 667 S.W.2d at 781. First, the reviewing court must look to see whether *Miranda* warnings were given. *Brown*, 422 U.S. at 603; *Sweeten*, 667 S.W.2d at 781-82. The second factor is the proximity of the confession to the arrest. *Brown*, 422 U.S. at 603; *Sweeten*, 667 S.W.2d at 781. The third factor for a court to consider is whether there was an intervening event between the illegal arrest and the statement. *Brown*, 422 U.S. at 603; *Sweeten*, 667 S.W.2d at 781. Fourth, the court must consider "the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at

22

604; *Sweeten*, 667 S.W.2d at 781. No single factor is decisive, but the third and fourth factors carry the greatest weight. *Monge*, 315 S.W.3d at 40; *Martinez v. State*, 620 S.W.3d 734, 742 (Tex. Crim. App. 2021) ("The purpose and flagrancy of the official misconduct is one of the most important factors."); *Sweeten*, 667 S.W.2d at 782 ("The last factor, and probably the most important, is the presence of intervening circumstances."). The State carries the burden of proving attenuation. *Monge*, 315 S.W.3d at 40.

## C. Application

We will briefly discuss the illegality of Appellant's arrest, and at what point it became unlawful. We will then discuss the applicability of each of the *Brown* factors.

### 1. Illegal Arrest

Pursuant to the Fourth Amendment, a warrantless arrest is per se unreasonable unless it fits into one of the "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). In Texas, a peace officer may arrest an individual without a warrant only if probable cause exists and the arrest falls within one of the exceptions contained in the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 14.01–.04; *Torres*, 182 S.W.3d at 901. The burden is on the State to establish a justified warrantless arrest or search. *Flores v. State*, No. 08-21-00129-CR, 2022 WL 3443644, at *3 (Tex. App.—El Paso Aug. 17, 2022, pet. filed) (not designated for publication).

The trial court found that, by approximately 6:35 p.m., Officer Avila, the arresting officer, had confirmed with dispatch that Oklahoma would not be seeking Appellant's extradition. Moreover, the court found that Officer Avila provided this information to an EPPD CAP

supervisor by 6:40 or 6:45 p.m. The trial court thus concluded that after "learning and confirming that Oklahoma authorities would not pursue extradition, the Oklahoma warrant was no longer a valid basis for [Appellant's] continued detention."

Both Garcia and Avila testified they did not have a legal basis to detain after it was discovered Oklahoma would not extradite him. In briefing to the court below, the State also conceded that continuing to hold Appellant after EPPD CAP learned that Oklahoma would not extradite was unlawful. Although the State acknowledges the trial court's factual findings, it argues on appeal that Garcia and Sanchez had developed "additional probable cause pursuant to TEX. CODE CRIM. PROC. ANN art. 14.03(a)(4) to establish that [Appellant] had committed a family-violence offense." Specifically, it claims that "[Appellant] was nervous and tearfully told investigators [,] within the first few minutes of the interview [,] that he had likely caused Brewer's injuries by dropping her." Even assuming for the moment that this statement is sufficient to provide law enforcement with probable cause to effectuate a warrantless arrest, Appellant's statement referencing a dropping came nearly a half hour *after* EPPD CAP officials discovered they no longer had a legal basis for an arrest and detention.

Moreover, at the suppression hearing, neither Avila nor Garcia testified to having any additional probable cause through a suspicion of family violence having occurred and did not articulate additional probable cause for which the trial court to base its finding on. Instead, the State focused on a good faith argument relating to the warrant and the voluntariness of Appellant's actions. The State sought to prove Appellant was told he was free to leave and voluntarily chose to stay and give a statement. Additionally, the State's response to Appellant's brief in support filed after the two suppression hearings, argues there was sufficient attenuation between Appellant's

24

illegal arrest and his interview. The only mention of probable cause in the State's response is in stating EPPD had probable cause to detain and arrest Appellant at UMC pursuant to the Oklahoma warrant. If the detectives had additional probable cause to detain Appellant, they simply failed to prove it during the suppression hearing. Also, the Court of Criminal Appeals has recently held that statements given after an illegal arrest cannot be used in hindsight to supply probable cause. *Martinez*, 620 S.W.3d at 743 ("In effect, the court of appeals used Appellant's confession given after his illegal arrest to supply probable cause. This was a mistake because facts discovered after an arrest cannot be used in hindsight to supply probable cause.").

As a result, we find that Appellant's statements, all of which were given after EPPD CAP knew it had no legal basis to continue to hold him, did not provide probable cause for his continued detention. Further, we conclude the trial court's findings—that EPPD CAP personnel knew, by 6:40 or 6:45 p.m., that they no longer had a legal basis for holding Appellant—is supported by the record. As a result, and because the State does not provide any other argument to justify its actions, we find that EPPD CAP's continued arrest of Appellant on June 10, 2015, after 6:45 p.m., was supported by neither a warrant, probable cause, nor any recognized exception to the Fourth Amendment's reasonableness requirement. *See Flores*, 2022 WL 3443644, at *3 ("Because Appellant was seized and his vehicle was searched without warrants, the State bore the burden to establish the reasonableness of Appellant's seizure and the search of his vehicle."). Appellant's continued arrest, therefore, was illegal.

### 2. *Brown* Factors

The trial court held that Appellant's video-recorded statement was admissible because it was "sufficiently attenuated from any unlawful detention." After analyzing the four *Brown* factors,

25

we disagree.

### a. Miranda warnings

*Miranda* warnings, which guard against self-incrimination under the Fifth Amendment, are an important factor in assessing the casual connection between an illegal arrest and a statement. *Martinez*, 620 S.W.3d at 741. The *Brown* Court, however, "carefully differentiated between the *Miranda* warnings, which are a procedural safeguard employed to protect Fifth Amendment rights against the compulsion inherent in custodial surroundings, and the exclusionary rule as utilized to effectuate the interests of the Fourth Amendment." *Id.* (quoting *Bell v. State*, 724 S.W.2d 780, 788 (Tex. Crim. App. 1986)). Consequently, "*Miranda* warnings alone cannot break the casual connection between the illegal arrest and the confession and cannot always assure that the illegal arrest in violation of the Fourth Amendment has not been exploited." *Martinez*, 620 S.W.3d at 741. As a result, even when a statement is found to be voluntary under the Fifth Amendment, its admissibility under the Fourth Amendment must be considered. *Id.*

The trial court found the detectives read Appellant his Miranda rights at the beginning of his recorded interview and at the beginning of the second interview purportedly initiated by Appellant. The State contends the testimony by Detective Garcia and the evidence of the recorded interview is enough to support the trial court's finding, weighing this factor in favor of the State. Although Appellant argues that both sets of *Miranda* warnings were defective because, while he acknowledged he understood his rights, he did not unequivocally waive them, rights protected by *Miranda* can be waived implicitly when an individual answers questions after hearing his rights and indicating he understands them. *Turner v. State*, 252 S.W.3d 571, 583-84 (Tex. App.— Houston [14th Dist.] 2008, pet. ref'd); *Hernandez v. State*, No. 14-15-00209-CR, 2016 WL

26

6134453, at *4 (Tex. App.—Houston [14th Dist.] Oct. 20, 2016, no pet.) (not designated for publication). As Appellant acknowledges, Garcia read him his *Miranda* warnings, Appellant stated he understood them, and then proceeded to talk with Garcia and Sanchez. For this reason, this factor weighs in favor of the State.

### b. Temporal proximity

Temporal proximity is generally not a strong determining factor. *Bell*, 724 S.W.2d at 788. Here, Appellant was arrested on the Oklahoma warrant around 4:52 p.m. and the interview began at about 7:00 p.m. The confession took place under three hours from his arrest. *Monge*, 315 S.W.3d at 41; *Bell*, 724 S.W.2d at 788. Although temporal proximity is generally not a strong determining factor, we conclude, and the State concedes, the short period of time between the illegal arrest and confession weighs in favor of Appellant. *Bell*, 724 S.W.2d at 788.

### c. Presence of intervening events

The presence of intervening events is an important factor in determining attenuation. *Monge*, 315 S.W.3d at 41. In instances where a confession is obtained through custodial interview after an illegal arrest, the confession should be excluded unless intervening events break the causal connection between the illegal arrest and the confession. *Id*. The intervening event ensures the confession is sufficiently an act of free will to purge any taint of the illegal arrest. *Id*. But, the lack of intervening events will not be dispositive if other *Brown* factors weigh in favor of the State. *Id*. Examples of significant intervening events include the opportunity to meet with family; the issuance of an arrest warrant based on information other than fruit of the illegal arrest; confronting the suspect with evidence untainted by the illegal arrest; and releasing the suspect from custody and informing him that he is free to leave. *Martinez*, 620 S.W.3d at 741.

For purposes of an intervening event, the State breaks down EPPD CAP's interview with Appellant into two parts. The first part of the interview, according to the State, begins at 7:00 p.m. and ends at 9:59 p.m. The second part of the interview begins at approximately 10:16 p.m. and ends twelve minutes later.

Regarding the purported first part of the interview, the State argues the intervening event was Appellant's "admissions to the detectives that he caused Brewer's injuries." But Appellant's statements were provided while he was still illegally under arrest. The video of the interview shows that Appellant was still handcuffed to a chair for the first forty-four minutes of the interview. Indeed, while Garcia testified that he told Appellant off camera during a break in the interview at approximately 9:00 p.m. that Oklahoma was not going to extradite him, the trial court found that Appellant "was not explicitly told he was free to leave . . . ." To claim that statements made by an accused while he is illegally detained may constitute an intervening event would otherwise undermine Fourth Amendment protections. Police would be permitted to make illegal arrests in the hopes their subject would make incriminating statements they could then urge in court to excuse their misconduct. This is not what *Brown* and its progeny mean by an intervening event. As a result, we conclude there was no intervening event during the first part of Appellant's interview.

For the purported second part of the interview, the State asserts that Appellant's request to keep speaking with the detectives was also an intervening event. As a threshold matter, it is not clear to the Court that this interview can be considered as two separate interviews. After an almost three-hour long interview, Garcia and Sanchez told Appellant they were going to stop the interview, as they had "been at this for a while." Appellant immediately asked if they could

continue talking. Garcia and Sanchez then leave the room for approximately fifteen minutes before returning to resume their questioning. The final twelve minutes of the interview appear to be a continuation of matters discussed during the previous three hours.

Nonetheless, the Court of Criminal Appeals has held that a defendant's request to speak to detectives after an unlawful arrest is an intervening event when the initiation is a product of his own free will. *Crutsinger v. State*, 206 S.W.3d 607, 611 (Tex. Crim. App. 2006) (holding the third factor weighed heavily in favor of the State because defendant requesting to speak to a detective, out of his own free will, was an intervening circumstance). However, the Court of Criminal Appeals indicated in *Martinez* that the circumstances surrounding an illegal arrest should be considered in determining whether a defendant's request to speak with police constitutes an act of free will. *See Martinez*, 620 S.W.3d at 743-44. Although some of the facts of this case vary from those found in *Martinez*—where law enforcement showed up at the defendant's house in the middle of the night without a warrant, took him to the police station, arrested him for murder, and handcuffed him to a bench in a cell before he voluntarily gave an incriminating statement— Appellant was arrested at the hospital where Brewer was being treated, then interviewed while handcuffed to a chair, and told by his interrogators that Brewer had died while they were speaking. *See Martinez*, 620 S.W.3d at 743-44. Further, Appellant was never explicitly told he was free to leave after EPPD CAP personnel learned they did not have a basis to detain him. As a result, we cannot conclude that Appellant asking to continue the interview was an independent act of free will, sufficient to purge the taint of the illegal arrest. For this reason, we conclude that no intervening event existed in this case. This factor weighs in favor of Appellant.

### d. Purpose or flagrancy of official misconduct

29

In attenuation cases, the purpose and flagrancy of the official misconduct "is one of the most important factors to be considered." *Bell*, 724 S.W.2d at 789; *Martinez*, 620 S.W.3d at 742. Flagrantly abusive police misconduct elevates the standard for the State to prove attenuation as to require "the clearest indications of attenuation." *Monge*, 315 S.W.3d at 42. The Court of Criminal Appeals has found flagrantly abusive official misconduct exists when: "reliance on factors in making an arrest which were so lacking in indica of probable cause as to render belief in its existence entirely unreasonable; an arrest effectuated as pretext for collateral objectives; or an arrest which is unnecessarily intrusive on personal privacy." *Bell*, 724 S.W.2d at 789–90. Additionally, the taint is not attenuated when the accused is arrested for no apparent justification and with the sole intent to extract a confession by exploitations. *Id*. Even when police misconduct does not shock the conscience, an inadmissible confession is still not admissible simply because the police misconduct was not too reprehensible. *Id*. at 790. But, when there is failure to get an arrest warrant, but probable cause exists, misconduct is comparatively less serious. *Id*. The Court of Criminal Appeals also recently found flagrant police misconduct when an arrest without probable cause was investigatory or was designed to cause fright, surprise, and confusion. *Martinez*, 620 S.W.3d at 742.

The State encourages us to consider the conduct of Avila, Sanchez, and Garcia in determining whether EPPD CAP's conduct was purposeful or flagrant. Specifically, it argues that Avila initially had probable cause to arrest Appellant based on the Oklahoma warrant and that Garcia and Sanchez "were always civil," "repeatedly gave [Appellant] refreshments," and "allowed him to use the restroom and smoke cigarettes." But the United States Supreme Court directs us to "consider the actions of all the police officers involved" in assessing a potential Fourth

Amendment violation. *Herring*, 555 U.S. at 140. Here, Garcia testified at the motion to suppress hearing that, on the day they interviewed Appellant, he and Sanchez were taking their directions from EPPD CAP supervisor, Sergeant Cosack. According to Garcia's testimony at the hearing, Cosack briefed him and a group of detectives regarding a callout from UMC on a female who had severe head trauma and was possibly not going to make it. Garcia received brief details on the victim and was also advised that patrol officers were with the boyfriend, who was the person who was last with her. Sergeant Cosack also mentioned that patrol officers reported that Appellant had a warrant and he was placed under arrest for the warrant at that time. Sergeant Cosack directed Detectives Garcia and Sanchez to interview "the male subject."

Further, Patrol Officer Avila testified that he informed an EPPD CAP supervisor, "most likely Sergeant Cosack," almost immediately after learning Oklahoma was not going to extradite Appellant. Consequently, by no later than 6:45 p.m.—or fifteen minutes before Appellant's interview began—Cosack, who was directly involved in the investigation of Brewer's injuries, was aware that EPPD CAP no longer had a valid basis for detaining Appellant. Yet, Cosack allowed Garcia and Sanchez to interview Appellant for nearly two hours (some of which Appellant was still handcuffed) before informing Garcia they did not have a legal basis to detain him. The collective action of the EPPD CAP officers—in both holding and interviewing Appellant when they knew they had no legal basis to hold or detain him—was an improper and flagrant violation of his Fourth Amendment rights. *Townsley v. State*, 652 S.W.2d 791, 797 (Tex. Crim. App. 1983) ("The action of the Austin police officers in holding the appellant for investigation of homicide when they knew they had no probable cause to arrest him was an improper and flagrant violation of his Fourth Amendment rights.").

The State also argues that flagrant conduct is lacking when the officers could have "arguably had enough information to get a warrant based upon probable cause" before Appellant's arrest. The State asserts that before Appellant was arrested on the Oklahoma warrant, they had existing knowledge of the severity of Brewer's injuries and the information from the hospital staff that there was a belief she sustained the injuries through an assault. But Garcia testified in the motion to suppress hearing that he had "minimal details" about Brewer, Appellant, or her injuries before the interview. The only information he testified to knowing before the interview was that there was a dying female at UMC with severe head trauma—a "possible homicide"—and that Appellant was possibly her boyfriend and the last person with her. Garcia further testified that he did not believe he had probable cause to arrest Appellant for Brewer's injuries when he started the interview at 7:00 p.m. As a result, we do not find that EPPD CAP arguably had enough knowledge to get a warrant based on probable cause before its interview with Appellant. *See Martinez*, 620 S.W.3d at 740 ("Probable cause must be based on facts and circumstances within the officer's personal knowledge or conveyed to the officer by reasonably trustworthy sources."). Therefore, this factor weighs in favor of Appellant.

We find three of the four attenuation-of-taint factors weigh in Appellant's favor. The only factor weighing in favor of the State is that detectives advised Appellant of his *Miranda* rights. After balancing the factors, we conclude the State did not meet its burden of proving the evidence obtained from Appellant's statement was sufficiently attenuated from the unlawful arrest. *See Monge*, 315 S.W.3d at 41–43. "When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity

32

of the courts." *Dunaway v. New York*, 442 U.S. 200, 218 (1979). The trial court erred in not suppressing the evidence.

### 3. Backpack contents

We next address whether the evidence obtained from Appellant's backpack and his buccal swabs should have been suppressed. The State first asserts that Appellant did not preserve error on the issue of suppressing the buccal swabs and items from his backpack and, if preserved, the trial court did not err because Appellant consented.

### a. Waiver

A complaint is not preserved for appeal unless it was made to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The State asserts Appellant did not raise complaints with sufficient specificity in the lower court as to the evidence. The State asserts Appellant never presented arguments regarding the evidence to the trial court during the motion to suppress hearings or in associated pleadings.

In response, Appellant urges the issue is not waived because there were two motions to suppress filed and one requested suppression of "all of the evidence which the State plans on introducing at the trial of this case" and asserts "the Government obtained said evidence without probable cause and without a valid warrant." Appellant also argues that the trial court addressed the evidence in its findings, showing it was an issue before the court. Specifically, the trial court made a finding that Appellant consented to the search of his backpack and agreed to provide a buccal swab. The trial court also made a finding that Appellant consented to the taking of his fingerprints.

33

The Fourth Court of Appeals found an appellant's argument on appeal to be waived because the arguments on appeal did not comport with the arguments to the trial court in support of his motion to suppress. *Rothstein v. State*, 267 S.W.3d 366, 373–74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). When the appellant moved to suppress evidence obtained from an illegal search, appellant argued to the trial court that the officer was not credible in his testimony and the search was conducted prior to obtaining a warrant. *Id*. at 372–73. On appeal, appellant argued the officer's initial entry into the house was constitutionally improper even without a search because there were no longer exigent circumstances. *Id*. The court held because the argument on appeal did not comport with any objection raised in the motion to suppress or at the suppression hearing, the appellant did not preserve error on the issue. *Id*. at 373–74.

The State argues this case is similar because Appellant failed to identify and request suppression of the buccal swabs and physical evidence from the backpack making his complaint on appeal waived. At the beginning of the first suppression hearing, the State sought to clarify if the only evidence Appellant requested suppression of was the statement. Defense counsel agreed that the only request was on the statements made by Appellant.

However, a different argument for the basis of suppression is not being argued. Rather, the argument at the hearings and on appeal is all evidence obtained from the illegal arrest should have been suppressed. Here, although the evidence and arguments focused on the statement, the contents from the backpack and buccal swabs were obtained during the same chain of events when Appellant was giving his statement. The evidence was considered during the suppression hearing and the trial. The general rule requires preclusion of all evidence obtained from an illegal arrest, unless sufficiently attenuated. *Bell*, 724 S.W.2d at 787. ("[W]e must

34

exclude all evidence obtained 'in violation of any provisions of the Constitution or laws of the State of Texas'. . . and all evidence that is obtained 'as a direct result of' the illegal detention under the exclusionary rule of the Fourth Amendment."). For this reason, we conclude the argument to suppress the contents of the backpack and buccal swabs was not waived.

### b. Suppression

The State asserts even if the issue was preserved for review, Appellant voluntarily consented to the search, and the trial court did not err in not suppressing the evidence. However, for the same reasons addressed above, the State failed to show that the evidence obtained was sufficiently attenuated from the illegal arrest. *Woods v. State*, 806 S.W.2d 351, 355 (Tex. App.—Texarkana 1991, pet. ref'd). The consent to a search is not enough to attenuate the taint of an illegal arrest when there was no break in the causal connection and the officer conduct was purposeful and flagrant. *Id*. at 354–55. The trial court erred in not suppressing the physical evidence.

### 4. Harmless error not shown

Texas Rule of Appellate Procedure 44.2(a) instructs us that in criminal cases involving constitutional error, we must reverse a judgment of conviction or punishment "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Thus, we can only affirm Appellant's conviction if we are convinced beyond a reasonable doubt that the trial court's error had no effect on the jury's verdict. *Morris v. State*, 554 S.W.3d 98, 125 (Tex. App.—El Paso 2018, pet. ref'd). While the rule does not expressly place the burden of proof on either party, the default is to reverse unless harmless error is properly shown. *Merritt v. State*, 982 S.W.2d 634, 636 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd); *Lamb v. State*, 603 S.W.3d 152, 162 n.16 (Tex. App.—Texarkana 2020, no pet.); *Morris*, 554 S.W.3d at

125. As a result, "if neither party does anything, the case will be reversed." *Merritt*, 982 S.W.2d at 636; *Lamb*, 603 S.W.3d at 162 n.16. This requires the State to come forward with reasons why the appellate court should find the error harmless. *Arnold v. State*, 786 S.W.2d 295, 298 (Tex. Crim. App. 1990) (placing the burden on the State to show harmless error under former Rule 81(b)(2), the predecessor to Rule 44.2(a)); *Merritt*, 982 S.W.2d at 636; *Lamb*, 603 S.W.3d at 163 n.16. Moreover, in a criminal trial, there is hardly ever more damaging evidence than the defendant's admission of guilt. *McCarthy v State*, 65 S.W.3d, 47, 56 (Tex. Crim. App. 2001) ("[A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him[.]") [Internal quotations omitted] (quoting *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991)).

Here, despite arguing harmlessness in other sections of its brief, the State did not brief harmlessness in relation to the admissibility of Appellant's interview. This omission may have been purposeful given the State's insistence at trial that the best evidence it had to prove Appellant was guilty were "the statements the defendant gives himself." Nevertheless, for us to independently review the evidence to evaluate whether the error was harmless beyond a reasonable doubt—when the State offered nothing to meet this burden—would wholly undermine the State's burden of proof requirement. *Arnold v. State*, 786 S.W.2d at 298 ("[A]s beneficiary of the error the State has the burden to show beyond a reasonable doubt that the error did not contribute to the verdict on punishment."). It would also place us in the position of being an advocate for the State, which we are not, and cannot be. *Lamb*, 603 S.W.3d at 162 n.16; *Meyer v. State*, 310 S.W.3d 24, 26 (Tex. App.—Texarkana 2010, no pet.) ("We do not, and cannot, create arguments for parties—we are neither the appellant's nor the appellee's advocate."). As a result, we decline to

independently evaluate whether the trial court's error was harmless in the absence of any briefing asserting such by the State. And we must reverse the trial court's judgment because it was not shown beyond a reasonable doubt that the admission of Appellant's constitutionally impaired interview, and related physical evidence, did not contribute to his conviction for murder. *See* TEX. R. APP. P. 44.2(a). Issues One and Two are sustained.

Because our sustaining of Appellant's first and second issues is dispositive of the appeal, we do not reach any of the remaining issues. *See* TEX. R. APP. P. 47.1

## IV.  CONCLUSION

Because we hold the trial court erred by denying Appellant's motion to suppress and that harmless error was not shown, we reverse the trial court's judgment and remand the cause for a new trial.


October 24, 2022

GINA M PALAFOX, Justice

Before Rodriguez, CJ., Palafox, and Alley, JJ

(Do Not Publish)